826 F.2d 1101
 264 U.S.App.D.C. 85
 NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
GTE Service Corp., et al., National Telephone Cooperative
Association, et al., American Telephone & Telegraph Co.,
Ameritech Operating Co., Mountain States Telephone &
Telegraph Co., et al., Satellite Business Systems, U.S.
Telephone Association, Telecommunication Research & Action
Center, South Central Bell Telephone Co., Southwestern Bell
Telephone Co., Intervenors.
AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
U.S. Telephone Association, GTE Service Corp., et al.,
Mountain States Telephone & Telegraph Co., et al.,
Bell Operating Companies, Southwestern
Bell Telephone Co., Intervenors.
The MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, et al.,
Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
GTE Service Corp., et al., Ameritech Operating Co., American
Telephone & Telegraph Co., Bell Operating
Companies, Southwestern Bell Telephone
Co., Intervenors.
PACIFIC BELL, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
GTE Service Corp., et al., Mountain States Telephone &
Telegraph Co., et al., Ameritech Operating Co., American
Telephone & Telegraph Co., Bell Operating Companies,
Southwestern Bell Telephone Co., Intervenors.
 Nos. 85-1087, 85-1457, 85-1471, 85-1472.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 30, 1986.
Decided Aug. 21, 1987.
 
 Petitions for Review of Orders of the Federal Communications commission.
 Raymond F. Scully, with whom Alan B. Sternstein, Katherine I. Hall, Washington, D.C., Saul Fisher, Bedminster, N.J., John B. Messinger, Robert L. Barada, Los Angeles, Cal., Stanley J. Moore, Susan E. Barisone, San Francisco, Cal., Vincent L. Sgrosso and R. Frost Branon, Jr., Atlanta, Ga., were on the joint brief for New England Tel. and Tel. Co., et al., petitioners in nos. 85-1087 and 85-1472 and intervenors in nos. 85-1457 and 85-1471.
 Jules M. Perlberg, Chicago, Ill., with whom David J. Lewis, Washington, D.C., Francine J. Berry, New York City, Mark C. Rosenblum, Basking Ridge, N.J., and Jonathan S. Hoak, Washington, D.C., were on the brief for AT & T Co., petitioner in no. 85-1457 and intervenor in nos. 85-1087, 85-1471 and 85-1472. J. Richard Devlin, Bedminster, N.J., entered an appearance for AT & T.
 Robert B. McKenna, Jr., Robert W. Barker, L. Andrew Tollin and Kenneth B. Patrich, Washington, D.C., were on the joint brief for Mountain States Telephone & Telegraph Co., et al., petitioners in no. 85-1471 and intervenors in nos. 85-1087, 85-1457 and 85-1472. Jeffrey B. Bork, Washington, D.C., entered an appearance for Mountain States Tel. & Tel. Co.
 John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Jane E. Mago, Counsel, F.C.C., Catherine G. O'Sullivan and Robert J. Wiggers, Dept. of Justice, Washington, D.C., were on the brief for respondents in nos. 85-1087, 85-1457, 85-1471 and 85-1472. Andrea Limmer, Dept. of Justice, and Linda L. Oliver, Counsel, F.C.C., Washington, D.C., entered appearances for respondents.
 
 
 1
 Alfred Winchell Whittaker, Washington, D.C., and Thomas J. Reeman were on the brief for intervenor, Ameritech Operating Companies in nos. 85-1087, 85-1471 and 85-1472.
 
 
 2
 Thomas J. O'Reilly and Patricia McClary, Washington, D.C., were on the brief for intervenor, U.S. Telephone Ass'n in nos. 85-1087 and 85-1457.
 
 
 3
 William Malone and James R. Hobson, Washington, D.C., were on the brief for intervenors, GTE Service Corp., et al. in nos. 85-1087, 85-1457, 85-1471 and 85-1472.
 
 
 4
 Daniel Davidson, Washington, D.C., entered an appearance for intervenor, Telecommunications Research and Action Center in no. 85-1087.
 
 
 5
 Kevin H. Cassidy, J. Manning Lee, McLean, Va., and Jeffrey H. Matsuura, Washington, D.C., entered appearances for intervenor, Satellite Business Systems in no. 85-1087.
 
 
 6
 William C. Sullivan, Linda S. Legg, Liam S. Coonan, Mary Whitten Marks and Michael J. Zpevak, St. Louis, Mo., entered appearances for intervenor, Southwestern Bell Telephone Co. in nos. 85-1087, 85-1457, 85-1471 and 85-1472.
 
 
 7
 David Cosson, Washington, D.C., entered an appearance for intervenors, Nat. Telephone Co-op. Ass'n, et al. in no. 85-1087.
 
 
 8
 J. Roger Wollenberg, Sally Katzen, Andrea Timko, John S. Hannon, Jr. and Ruth E. Sigler, Washington, D.C., were on the brief for amicus curiae, Communications Satellite Corp., urging reversal in nos. 85-1087, 85-1457, 85-1471 and 85-1472.
 
 
 9
 Before MIKVA and BUCKLEY, Circuit Judges, and PARSONS,* Senior District Judge.
 
 
 10
 Opinion for the Court filed by Circuit Judge MIKVA.
 
 
 11
 Dissenting opinion filed by Circuit Judge BUCKLEY.
 
 MIKVA, Circuit Judge:
 
 12
 Petitioners American Telephone and Telegraph Company ("AT & T") and numerous former Bell operating telephone companies ("BOCs") seek review of orders of the Federal Communications Commission ("the Commission") requiring them to grant rate reductions. The reductions are designed to reimburse consumers for earnings enjoyed by AT & T and the BOCs in 1978 which were over and above a rate-of-return ceiling previously prescribed by the Commission. Petitioners challenge the orders on a number of grounds, the most substantial of which is that the Commission had no authority under the Communications Act to impose such a remedy. We conclude that the Commission had ample authority to order reductions to enforce its prior rate-of-return prescription, and we deny the petitions for review.
 
 I. BACKGROUND
 A. Regulatory Structure
 
 13
 The Communications Act of 1934, ch. 652, 48 Stat. 1064 (codified as amended at 47 U.S.C.) (the "Act"), provides the regulatory ratemaking scheme within which these petitions arise. Section 203 of the Act places primary responsibility for initiating rate revisions upon the carrier. 47 U.S.C. Sec. 203. Once a carrier initiates a revision, the Commission is empowered under section 204 of the Act to suspend implementation of the proposed tariff for up to five months while it investigates the lawfulness of the proposed rates. 47 U.S.C. Sec. 204. If the Commission's investigation is not completed within that time, the proposed tariff automatically goes into effect. In such a case, however, section 204 empowers the Commission to make the increases subject to an accounting and refund order: if the Commission later determines that the revisions are excessive, it may order the carrier to refund the unjustified amount to those customers who have been overcharged. Id.; see Nader v. FCC, 520 F.2d 182, 198 (D.C.Cir.1975).
 
 
 14
 Section 205 of the Act, which is of particular relevance to this dispute, governs the Commission's authority to regulate existing rates. Under section 205, the Commission can initiate an investigation into any carrier rate or practice. If the Commission determines that a carrier rate is or will be unlawful under the Act, it may prescribe the "just and reasonable charge ... to be thereafter observed." 47 U.S.C. Sec. 205. This power of prescription is a potent tool: once the Commission issues a prescription order under section 205, the carrier must "cease and desist from such violation ... and shall not thereafter publish, demand, or collect any charge other than the charge so prescribed, or in excess of the maximum ... so prescribed." Id.
 
 
 15
 The Commission in this case also relied on section 4(i) of the Act. That section authorizes the Commission to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions." 47 U.S.C. Sec. 154(i). As we detail below, section 4(i) previously has been held to justify the use of rate-of-return prescriptions, as opposed to prescriptions of actual rates.
 
 B. Regulatory History
 
 16
 Although it had recommended appropriate return levels as early as 1967, the Commission first began to use its section 205 powers to prescribe a rate of return, as opposed to a prescription of actual rates, for the AT & T system in 1972. The Commission decided to undertake a rate-of-return prescription because AT & T had become so huge and diverse that individual rate determinations for each service were impractical. The 1972 order fixed a rate of return of 8.5% and rejected proposed AT & T tariffs that would have provided the company with a higher return. AT & T's challenge to that order called on this court to determine whether the Commission's section 205 powers permitted the agency to prescribe rates of return as well as rates. See Nader v. FCC, 520 F.2d 182, 199-205 (D.C.Cir.1975). In Nader, we determined, as a threshold matter, that the Commission's order fixing a rate of return was indeed a prescription. We concluded that "[w]e would be shirking reality if we did not recognize that the practical effect of the Commission's ... order was to limit prospectively AT & T's rate of return to 8.5%, and thus [the order] was a prescription under section 205." Id. at 201; see also id. at 202 (the Commission's order was intended "to have the prospective effect of a prescription, thus, limiting the utility to that return.").
 
 
 17
 We then found that the Commission's prescription of a rate of return was consonant with the agency's statutory authority under the Act. Id. at 203-05. Even though section 205 refers only to the Commission's power to prescribe "charges, classifications, regulations and practices," we found that prescription of a rate of return was proper under section 4(i), which gives the Commission the power to issue such orders "as may be necessary in the execution of its functions." Id. at 203. In holding that "the Commission lawfully prescribed a rate of return for AT & T," id. at 204, we noted that "the effect of the prescription is to protect AT & T from the possibility of refunds on the ground that an 8.5% rate of return was too high, [although] the Commission retains full latitude to order refunds on all other grounds." Id. at 205 n. 25.
 
 
 18
 With the issue of its power to prescribe rates of return thus settled, the Commission proceeded in 1976 to set a rate of return of 9.5% for the AT & T system. See American Tel. & Tel. Co., 57 F.C.C.2d 960 (1976). The Commission added to the 9.5% figure a buffer of .5% "in order to provide an incentive to increase productivity and efficiency." Id. at 973. In effect, while the Commission prescribed a 9.5% rate, it let AT & T know in advance that it would tolerate "a level or range of interstate earnings not to exceed 10%" before it took remedial action. Id.
 
 
 19
 AT & T responded to the Commission's prescription by filing a tariff structure designed to produce no more than a 10% rate of return. Without making a specific finding that they were just and reasonable, the Commission permitted these rates to go into effect on March 1, 1976. In 1976 and 1977, the rates produced a rate of return under 10%. However, the same rates in 1978 resulted in a rate of return which all parties agree exceeded the prescribed 10% ceiling.
 
 
 20
 Although it took a great deal of time to do so, see Telecommunications Research & Action Center v. FCC, 750 F.2d 70 (D.C.Cir.1984), the Commission eventually responded to AT & T's excessive rate of return in December of 1984, when it ordered the company to reduce its rates to refund the excess earnings to consumers. See J.A. 23-33. In its order, the Commission rejected AT & T's argument that the 1976 prescription was meant to be not a ceiling on AT & T's rate of return but only a target for setting rate levels; the Commission observed that the plain language in the prescription order restricted AT & T to a return of not more than 10%. J.A. 27. The Commission cited to sections 205 and 4(i) of the Act, as well as our decision in Nader, in justifying its authority to enforce its prescription by ordering refunds. J.A. 28. The Commission also rejected AT & T's argument that changing economic conditions had rendered the 10% rate of return unlawfully low and therefore precluded the Commission's enforcement of the rate. The Commission explained that under the Act the carrier bears primary responsibility for initiating changes in existing prescriptions; since AT & T had initiated no such revision, the 1976 prescription remained in effect in 1978. J.A. 27.
 
 
 21
 The Commission determined that AT & T had enjoyed a 10.22% rate of return in 1978. The Commission derived the 10.22% figure from AT & T's own Interstate Monthly Report ("IMR"), which AT & T had filed with the Commission in January 1979. AT & T subsequently had submitted an "FDC Report" in which the company maintained that its rate of return for 1978 had been 10.09%. In the proceeding leading up to the orders under review, AT & T urged the Commission to compute the rate reductions based on the 10.09% figure. AT & T insisted that the 10.22% figure did not adequately account for certain services and facilities provided to other common carriers, and that integrating the relatively slight earnings of those services and facilities into the computation resulted in a net rate of return of 10.09%. The Commission, however, chose to rely on the IMR, as it had for the previous 28 years in computing AT & T's rate of return. The 10.22% reflected excessive 1978 earnings for AT & T in the amount of one hundred one million dollars. The Commission ordered AT & T and its former operating companies (AT & T had by this time been divested) to lower its rates by an amount sufficient to reimburse ratepayers for that amount plus interest. J.A. 26.
 
 
 22
 In two reconsideration orders, the Commission substantially reaffirmed its December 1984 order, imposing only slight alterations not at issue here. See J.A. 43-80. Specifically, the Commission again concluded that it had the statutory authority to impose the refunds on AT & T and the BOCs, that its decision did not represent a reversal of longstanding policy not to impose refunds for violations of prescriptions, and that AT & T had earned a 10.22% rate of return in 1978. AT & T and ten BOCs responded with these consolidated petitions for review. The petitioners' efforts to overturn the Commission's orders are championed in whole or in part in intervenors' briefs filed by the Ameritech Operation Companies, the United States Telephone Association, and GTE, and an amicus curiae brief filed by the Communications Satellite Corporation.
 
 II. DISCUSSION
 
 23
 Petitioners make three basic challenges to the Commission's orders. The first, and most important, of their contentions is that the Commission has no authority under the Communications Act to impose refunds for earnings in excess of a prescribed rate of return. A second and related argument is that even if the order did not violate the Act, it departed from prior policy without adequate explanation and with unfairly retroactive effect. Third, petitioners allege various infirmities in the Commission's methods of calculating the amount of the refund liability. We address each of these contentions in turn.
 
 A. Statutory Authority
 
 24
 Petitioners' challenge to the Commission's authority to issue the orders under review reveals two points of fundamental opposition to the agency's view of its regulatory authority. First, petitioners differ with the Commission as to the effect of the 1976 prescription. They contend that the nature of their obligation was merely to try in good faith to formulate rates that would not produce an excessive return. In the Commission's view, by contrast, the prescription imposed a maximum return that the carriers could not exceed, however innocently. Petitioners also argue that in any event the Commission has no power to impose refunds to remedy a violation of rate-of-return prescriptions. This argument as to remedy is linked to the first contention: if the prescription obliged the carriers only to design responsive rates, the Commission would be overreaching in adopting a remedy that in effect retroactively adjusts rates that appeared reasonable when implemented. We consider first the nature of the Commission's power to prescribe rates of return and then take up the related issue of the Commission's remedial reach.
 
 
 25
 Petitioners acknowledge that once the Commission prescribes a rate of return, they are required to submit rates designed to achieve no more than that rate. Under petitioners' view of the regulatory scheme, however, that is all they are required to do; if they err, and rates designed to achieve a lawful return turn out to generate an excess, the prescription has not been violated. Petitioners' argument, in short, is that the Commission may prescribe constraints only on carriers' subjective efforts, not on future events. We see no reason to adopt this narrow reading of "prescription," especially when it is opposed by a more reasonable interpretation by the Commission. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The Commission's chief concern in issuing prescriptions is protecting just and reasonable rates, not policing carriers' states of mind. The idea of a prescription under section 205 is that the agency has proclaimed that a certain situation--here a return in excess of 10%--is unlawful and shall not occur. Certainly carriers cannot intentionally try to violate an outstanding prescription, but that does not mean that they may achieve through inadvertence what they are forbidden from doing by design.
 
 
 26
 A central defect in petitioners' argument is a failure to recognize the import of our prior decision in Nader approving the Commission's authority to prescribe rates of return. Nader established that the Commission may determine what rate of return ust be thereafter observed in the same way it may set a just and reasonable rate to be thereafter observed. We expressly recognized as much when we wrote that the Commission's order had "the prospective effect of a prescription, thus, limiting the utility to that return." Nader, supra, 520 F.2d at 202 (emphasis added). Here the Commission has exercised its legal prerogative to prescribe a rate of return, rather than a rate. The teaching of Nader is that such a prescription is no less binding. If the order setting the maximum rate of return was a valid section 205 prescription, as it clearly was after Nader, it had "the force of a statute.... The carrier ... is bound to conform." Arizona Grocery v. Atchison Ry., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1931). See also American Telephone & Telegraph Co. v. FCC, 487 F.2d 865, 874 (2d Cir.1973) (carriers are compelled to adhere to prescriptions by Commission).
 
 
 27
 Having established that the Commission reasonably determined that AT & T's 1978 earnings violated the outstanding prescription, we turn to the question of remedy. Petitioners insist that no section of the Act empowers the Commission to grant refunds for a violation of a prescription. Petitioners point out that section 204 is the only provision in the Act to expressly mention "refunds," and it applies only to Commission action following suspension of new or revised rates; the order under review corrected rates that already had been in effect for two years. Section 205, petitioners observe, is forward-looking: the Commission uses it to prescribe charges and practices "to be thereafter observed." In petitioners' view, by contrast, the Commission's order was a classic example of retroactive ratemaking, which is forbidden under a plethora of case law interpreting sections 204 and 205 and similar provisions in analogous regulatory schemes. Finally, petitioners argue that the Commission cannot cure its lack of authority by reliance on section 4(i), because that provision authorizes only such orders as are "not inconsistent with this Act," and retroactive refunds are inconsistent with the Act.
 
 
 28
 The petitioners buttress their textual arguments with an observation that the prohibition against retroactive ratemaking is designed to achieve an overall regulatory balance between the interests of consumers, who need protection from unreasonably high rates, and those of carriers, who need assurance of a reasonable rate of return. Under a prospective ratemaking scheme, carriers are precluded from recouping shortfalls during lean years, but they are compensated by being permitted to retain excess earnings from unexpectedly profitable years. This balance, petitioners argue, is destroyed if the Commission can order refunds to enforce a ceiling on a carriers' return without also guaranteeing the carriers some minimum reasonable return.
 
 
 29
 In addressing petitioners' concerns, we note at the outset that although petitioners and the Commission both refer to the rate reductions as a "refund," the order does not impose a refund in the classic sense of restitution to an overcharged party. Here the reductions will accrue to the benefit of a different customer base from the base that contributed to AT & T's excessive earnings. The Commission's order therefore is more precisely considered a prospective rate adjustment to compensate for past surpluses. See J.A. 26. This case does not, however, turn on the arguably overfine semantic distinction between a refund and a prospective adjustment: even allowing for argument's sake that the Commission imposed a refund, the order was well within the agency's statutory authority.
 
 
 30
 As petitioners observe, section 204 is the only provision of the Act explicitly to mention refunds, and it does not apply to the circumstances of this case. The Commission, however, relied on another section of the Act--section 4(i)--to impose rate reductions in the amount of AT & T's excessive 1978 earnings. That provision empowers the agency to perform any act "not inconsistent with this Act, as may be necessary in the execution of its functions." We find this wide-ranging source of authority adequately supports the Commission's remedial action. In a strictly technical sense, the Commission's choice of remedy was absolutely necessary; without the reductions, the carriers in fact would not be limited to a return of 10% and the prescription would be violated. More generally, the Commission enjoys significant discretion to choose among a range of reasonable remedies, including refunds. See Las Cruces TV Cable v. FCC, 645 F.2d 1041, 1047 (D.D.Cir.1981). The Commission does not have to show that it selected the only conceivably appropriate remedy in order to invoke its 4(i) powers. See North American Telecommunications Ass'n v. FCC, 772 F.2d 1282, 1292 (7th Cir.1985) (section 4(i) is a "necessary and proper clause" empowering the Commission to "deal with the unforeseen ... to the extent necessary to regulate effectively those matters already within the boundaries"). Although, as petitioners point out, there are other corrective measures the Commission might have chosen, the measure it adopted in this case was appropriate and reasonable. As we said recently in another case approving of an agency's refund order, "[t]he question eventually reduces to one of judgment, informed by the policy of the statute that Congress has seen fit to enact. We find the agency's judgment ... to be fully consistent with the Commission's broad mandate from the Article I branch to assure that all rates are just and reasonable." Southern California Edison Co. v. FERC, 805 F.2d 1068, 1072 (D.C.Cir.1986).
 
 
 31
 Petitioners nevertheless insist that a refund remedy is inconsistent with the Act, and therefore an inappropriate exercise of power under section 4(i), because it amounts to retroactive ratemaking. This argument again overlooks the force of our decision in Nader and the Commission's subsequent 1976 rate-of-return prescription. There was not retroactive ratemaking here, because the carriers' obligations were set prospectively in 1976, when the Commission forbade AT & T from earning more than 10%. The 1984 order under review merely recognized that the prior prescription had been violated and imposed a remedy for that violation. As the Commission explained, the refund order is a "dispassionate remedy for a violation in fact of an earnings ceiling. The carriers are being required merely to give up what they never should have collected in light of the rate of return prescription." FCC Br. 25 n. 31. This case is thus no different from one in which the Commission prescribed actual rates and the carrier, either intentionally or inadvertently, collected higher charges. Although no carrier has yet been so brazen, there can be little doubt under such circumstances but that the Commission would be well within its authority in forcing the carrier to disgorge the unlawful excess. Cf. United States v. Corrick, 298 U.S. 435, 56 S.Ct. 829, 80 L.Ed. 1263 (1936) (Commission can reject rate filings in excess of prescribed rates). The Commission has no more engaged in retroactive ratemaking here just because it is acting to enforce a rate-of-return prescription rather than a rate prescription.
 
 
 32
 Nor does the Commission order foster an impermissible imbalance between the interests of carriers and those of consumers. First, the Commission's 1976 prescription did provide a measure of protection for the carriers. As we noted in Nader, "the effect of the prescription is to protect AT & T from the possibility of refunds on the ground that an 8.5% rate of return was too high." 520 F.2d at 205 n. 25. Thus, had the cost of capital plunged in 1977, so that AT & T's return in that year of 9.59% was far above the reasonable minimum necessary to attract continued investment, the Commission nevertheless would not have been able to order a refund; rather, it would have had to initiate a new Section 205 proceeding and issue a new rate-of-return prescription, which would have had prospective force only.
 
 
 33
 It is true that the current regulatory scheme is asymmetric on another level. Since the Commission has so far declined to set minimum guaranteed rates of return for the carriers (although it has not foreclosed the possibility of doing so in the future), carriers must refund excess earnings, but they are not compensated for shortfalls. The carriers, however, have no statutory entitlement to a perfectly balanced regulatory scheme; rather, they are entitled only to earn an overall reasonable return. The Commission has concluded that a guaranteed minimum annual return is not essential to protect that right. That conclusion is a reasonable one. Under the Act, the carriers have the opportunity and responsibility to file rates that provide an adequate return. In this sense they are unlike consumers, who rely predominantly on the Commission to protect their right to just and reasonable rates. Moreover, the Commission supplements its rate-of-return prescriptions with a buffer, in this case amounting to .5%. This added increment makes it easier for the carriers to design charges that provide a rate of return in the vicinity of the prescribed ceiling. This scheme, in fact, more than adequately protected the carriers' interests in relation to the 1976 rate-of-return prescription at issue. During the five-year period in which the prescription was in effect, AT & T earned less than the prescribed ceiling of 9.5% in only one year, 1976, when it earned 9.25%. Overall, its average earnings during that period were 9.69%, well above the prescribed limit. In three of the five years, the carrier's rates were designed precisely enough to produce a return above the ceiling but not so far above as to trigger a Commission remedy. Finally, the carriers can always initiate a request to increase their rates when the current tariff appears likely to result in a shortfall. Thus, the current system appears to provide ample protection for the carriers' interests without any guaranteed minimum rate of return. Should this state of affairs not hold in the future, the Commission and the courts can address the situation at that time.
 
 
 34
 In sum, the Commission was justified in finding that AT & T's excessive earnings in 1978 violated the agency's outstanding rate-of-return prescription. Having made that finding, the Commission properly exercised its authority under section 4(i) to remedy the violation by ordering rate reductions in the amount of AT & T's excessive earnings in 1978.
 
 
 35
 B. Retroactive Application of a Newly-Announced Policy
 
 
 36
 Several petitioners argue that even if the Commission's order did not violate the Act, it represented an abrupt reversal of prior Commission policy which could not lawfully be applied to parties who relied on the previous state of affairs. As AT & T sees it, for example, the Commission previously had followed a "target/trigger" policy, under which rate-of-return prescriptions served as targets for carrier tariffs, and excessive earnings triggered prospective relief in the form of rate adjustments. AT & T argues that it is being unfairly subjected to newly-adopted regulatory standards to which it has not had an opportunity to conform its behavior.
 
 
 37
 In large part, this claim relies on the same premise as the argument that the prescription obliged the carriers only to design rates not to exceed the Commission's ceiling. To the extent it does, we reject it for the same reasons. Once the Commission prescribed a maximum rate of return of 9.5% with a .5% buffer, it was not reasonable for the carriers to think that the agency had an affirmative policy of permitting carriers who earned above 10% to retain the unlawful excess. It is true that the Commission had not put the carriers on specific notice that it would respond to unlawfully high returns by ordering refunds. Importantly, however, the Commission had not had occasion to do so; never before had a carrier exceeded a rate-of-return prescription.
 
 
 38
 The dissent contends that carriers twice before--in 1967 and 1968--exceeded the prescribed rate of return. Dissent at 4, 9-10. This contention is a cornerstone of the dissent's argument that the enforcement scheme adopted in this case represented a radical change in policy. The dissent overlooks the vital point that the Commission first prescribed a rate of return in 1972. Although it incorporated a rate-of-return recommendation, the 1967 order was not a rate-of-return prescription, and thus the portion of that order the dissent cites, see dissent at 4, is immaterial. The whole point behind our decision today, and our previous holding in Nader, is that the ratemaking regime changed in 1972 when the Commission began to use its section 205 powers to prescribe rates of return. That action represented a new approach to rate regulation, and its legitimacy was precisely what the fight was about in Nader.
 
 
 39
 Given that no carrier had ever exceeded a prescribed rate of return and that the Commission had never foreclosed the remedy it imposed in this case, the most petitioners can claim is that the order under review instituted a new policy for a new situation. This action is something very different from a departure from a clear prior policy. We recently recognized the distinction in rejecting a very similar claim that an agency refund order was a departure from prior precedent. Petitioner in that case contended that the Federal Energy Regulatory Commission retroactively applied a new policy when it ordered a refund of excessive earnings. See Southern California Edison Co. v. FERC, 805 F.2d 1068 (D.C.Cir.1986). The court noted, "no agency precedent expressly addresses this precise issue.... We are in new territory here." Id. at 1071. Confronted with a novel set of circumstances, as we are in this case, the court rejected petitioner's claim that the Commission had departed from prior policy.
 
 
 40
 Finally, even if the enforcement order instituted a departure from a previous clearly articulated policy, petitioners would have no right to have the "new" policy not apply to them. Generally speaking, an agency may be prevented from applying a new policy for one of two reasons (in addition to the standard constraints that apply to any agency decision). First, a departure from prior policy cannot stand when the agency fails to explain the reason for the change. See Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). Second, under certain circumstances an agency may be prevented from applying a new policy retroactively to parties who detrimentally relied on the previous policy. See RKO General v. FCC, 670 F.2d 215, 223 (D.C.Cir.1981), cert. denied, 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 442 (1982). Petitioners can avail themselves of neither of these doctrines. As we detailed above, the Commission amply explained the source and need for its authority to remedy violations of its prescriptions by imposing refunds. This explanation fulfilled the Commission's responsibilities under Greater Boston. As for the retroactivity claim, petitioners have made no showing whatsoever of detrimental reliance. Indeed, it is difficult to imagine how they might make such a showing. Petitioners have insisted, as they must, that they made every effort to comply with the prescription by designing rates that would produce earnings of less than 10%. Presumably they would have behaved no differently had they clearly understood that excessive earnings might trigger a refund order. Thus, there is no evidence that petitioners relied to their detriment on their understanding of the Commission's prior policy. In sum, even had petitioners demonstrated, which they have not, that the Commission's order departed from prior policy, they would have no equitable claim to shield them from application of the order to them.
 
 
 41
 The dissent posits that AT & T relied on an enforcement scheme that precluded refunds by not filing for rate increases and by not having an opportunity in 1978 to convince the agency that its earnings were reasonable under then-prevailing economic conditions. Dissent at 13-15. But AT & T had every incentive and opportunity to file for an increase if it believed that the outstanding rate-of-return prescription was inadequate. It is irrational to surmise that the carrier would have declined to try to maximize its allowable profits in 1979 because it believed it would be able to retain its windfall of 1978. As for its opportunity to protest the decision, AT & T has offered a fierce challenge now, so no remedy has been assessed without the carrier's having had a full opportunity to air all its claims. We thus can perceive no possibility of detrimental reliance in this case.
 
 C. Computation of the Refund
 
 42
 Three final arguments address the Commission's actual computation of petitioners' liability. First, petitioners claim that the Commission should have calculated the carriers' rate of return over the entire period during which the rates at issue were in effect, rather than isolating AT & T's excessive earnings for 1978. The rates were in effect from 1976 to 1980, during which they produced an overall rate of return of 9.69%. The Commission admittedly gave only a cursory explanation for its decision to enforce the prescription on an annualized basis. It reasoned in a footnote that it adopted a calendar-year measure because carriers' revenues, expenses, and income tax liabilities are typically evaluated on a fiscal year basis, and AT & T's own fiscal year coincided with the calendar year. J.A. 25-26 n. 12. This explanation, while brief, is sensible enough, especially since the Commission was enforcing a prescription of an annual rate of return. Moreover, prescriptions usually remain in effect for an indefinite period. Under petitioners' preferred scheme, the Commission would never be able to find and remedy a violation until it opted to issue a new prescription, because the agency would not know until then over what period the prior prescription was in force. In short, while the Commission perhaps might have opted for a different interval of measurement, cf. Authorized Rates of Return, 50 Fed.Reg. 41350 (October 10, 1985) (two-year interval), its choice of the traditional calendar year certainly was not unreasoned.
 
 
 43
 Petitioners also urge that the FCC failed to meet its burden of adducing substantial evidence for its determination that AT & T earned a 10.22% return in 1978. The Commission, however, amply supported its decision to rely on the 10.22% figure in the IMR that AT & T filed in January 1979 rather than the 10.09% figure in the subsequent FDC Report. First, the Commission pointed out that the agency and the industry had relied on the IMR return figures for 28 years, whereas the FDC Reports first had been submitted in 1977. J.A. 25. Second, certain of the computations in AT & T's FDC Report relied on extrapolations from the month of June 1978, even though, in the Commission's opinion, AT & T had not shown that the June figures were perfectly representative of the year's earnings. Id. Thus, the Commission adduced substantial evidence for both its confidence in the traditional IMR and its lack of confidence in the FDC Report that AT & T urged the Commission to employ. We therefore have no cause to doubt the reasonableness of the Commission's reliance on the 10.22% figure.
 
 
 44
 Finally, intervenor United States Telephone Association argues that the Commission should not be able to require petitioners to pay interest on the excess earnings for the entire period between January 1, 1979, and the date on which carriers file tariffs to implement the refund. USTA believes the Commission abused its discretion in ordering full interest payments in light of the Commission's own prolonged delay in responding to the violation. While this court does not condone the Commission's delinquency in resolving this matter, see Telecommunications Research & Action Center v. FCC, 750 F.2d 70 (D.C.Cir.1984), we perceive no inequity in requiring petitioners to pay full interest on earnings they had no right to retain in the first place.
 
 III. CONCLUSION
 
 45
 The order under review was a straightforward and legitimate means for the Commission to enforce its 1976 rate-of-return prescription. In ordering a rate reduction in the amount of petitioners' excessive earnings, the Commission acted within its authority under the Communications Act and did not depart from prior policy. Finally, the Commission's method of computing the excess was reasonable and supported by substantial evidence. For these reasons, the petitions for review are denied.
 
 
 46
 It is so ordered.
 
 BUCKLEY, Circuit Judge, dissenting:
 
 47
 Section 4(i) of the Communications Act is sufficiently broad and the principles of deference to agency decisionmaking sufficiently strong that, in the judgment of the majority, the FCC has statutory authority to enforce a prescribed maximum rate of return. Correct or not, the majority overstates the case. For more than fifty years, the Communications Act has been understood to establish a precise, express statutory scheme governing refunds and the setting of rates. Never before has section 4(i) been held to authorize refunds. While there is always a time for firsts, I think it must be admitted that, even if lawful, the FCC here operates at the feather edge of its statutory authority.
 
 
 48
 This is not the occasion to decide the statutory issue. Without notice, the FCC altered its fundamental policy basing rates of return exclusively on current market conditions, and instead ordered a reduction in future rates based on past surplus. The Refund Order should be set aside because it contradicts the system of ratemaking previously articulated and applied by the FCC.
 
 I. RETROACTIVITY DOCTRINE
 
 49
 In this circuit, as we have so recently confirmed, the test presented in Retail, Wholesale & Dep't Store Union v. NLRB, 466 F.2d 380, 390 (D.C.Cir.1972), "provides the framework for evaluating retroactive application of rules announced in agency adjudications." Clark-Cowlitz Joint Operating Agency v. FERC, 826 F.2d 1074 at 1081 (D.C.Cir.1987) (en banc). Five "non-exhaustive" factors are set forth therein to distinguish between legitimate retroactive application of policy and those instances when an agency must proceed prospectively:
 
 
 50
 (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.
 
 
 51
 Retail, Wholesale, 466 F.2d at 390.
 
 
 52
 Taking the test in reverse order, I summarize my objection to the 1984 Refund Order: (1) Unlike the typical case in which an agency announces a rule through an adjudication, the FCC has formally and expressly admitted that the 1984 refund order "was not intended to establish a rule for all future proceedings...." Return Interstate Services of AT & T Communications and Exchange Telephone Carriers, 50 Fed.Reg. 33,786, 33,788 (1985) (proposed Aug. 21, 1985). Instead, the FCC subsequently engaged in formal rulemaking to announce a policy of automatic refunds under specified circumstances. Authorized Rates of Return for Interstate Services of AT & T and Exchange Telephone Carriers, 50 Fed.Reg. 41,350 (1985) (final rule); Return Interstate Services of AT & T Communications and Exchange Telephone Carriers, 51 Fed.Reg. 1,795 (1986) (to be codified at 47 C.F.R. Part 65). Hence the retroactive application of the policy in the present case advances no statutory purpose; (2) The Refund Order imposes a $101 million penalty on AT & T plus interest for rates filed in 1976 and never changed until 1980. This is a burden by any standard. See NLRB v. Bell Aerospace Co., 416 U.S. 267, 295, 94 S.Ct. 1757, 1772, 40 L.Ed.2d 134 (1974) (prospective application favored when "fines or damages" are assessed and agency imposes new liability "for past actions which were taken in good-faith reliance on [agency] pronouncements."); (3) AT & T relied on the settled statutory scheme, confirmed in countless cases, that refunds, to be lawful, can only arise by operation of section 204 of the Communications Act. Furthermore, this court finds that were it not for section 4(i), the FCC order would be conclusively and without question unlawful. See Maj. at 1107, 1109; see also MCI Telecommunications Corp. v. FCC, 765 F.2d 1186, 1195 (D.C.Cir.1985) ("In enacting Sections 203-05 of the Communications Act, Congress intended a specific scheme for carrier initiated rate revisions. A balance was achieved after careful compromise. The Commission is not free to circumvent or ignore that balance. Nor may the Commission in effect rewrite this statutory scheme on the basis of its own conception of the equities of a particular situation.") (quoting American Telephone and Telegraph Co. v. FCC, 487 F.2d 865, 880 (2d Cir.1973)); Sea Robin Pipeline Co. v. FERC, 795 F.2d 182, 189 n. 7 (D.C.Cir.1986) (The Commission "may not order a retroactive refund based on a post hoc determination of the illegality of a filed rate's prescription."); (4) The FCC cannot and does not cite a single sentence from among hundreds of pages of its regulatory decisions detailing the policy upheld today. Rarely are departures from established policy as abrupt; (5) The majority states that "the Commission first prescribed a rate of return in 1972. Although it incorporated a rate-of-return recommendation, the 1967 order was not a rate-of-return prescription, and thus the portions of that order the dissent cites ... are immaterial." Maj. at 1109 (emphasis added). Yet the FCC in its own rulemaking expressly holds to the contrary:
 
 
 53
 This Commission established a prescribed rate of return for the interstate telecommunications services of [AT & T in 1967 ]. That prescription was revised in 1972, 1976, and 1981.
 
 
 54
 50 Fed.Reg. at 33,786 (1985) (footnotes omitted); see also 57 F.C.C.2d 960, 960 (1976) ("This proceeding represents the third time [1967, 1972, & 1976] the Commission has considered the fair rate of return of [AT & T]...."). As a matter of logic, it is untenable to argue that remedying an excess rate of return represents a case of "first impression." This is a core function of any rate regulator. As a matter of fact, the FCC twice before was confronted by AT & T rates in excess of the prescribed return. See infra at 1115-16.
 
 
 55
 It ultimately took the FCC six years to reach the conclusion that it (a) had the authority and (b) had given AT & T lawful notice that returns earned in excess of the prescribed rate of return would be subject to future disgorgement. The majority says this power came into being in 1972. The FCC nowhere in its brief or on the record makes this argument. Indeed, the alteration in the FCC position is dazzling. In 1967, the FCC said "the policies we are establishing on the basis of the record of this proceeding require no drastic change in any of the standards heretofore applied and represent no new or essentially different approach by this Commission to the regulation of respondents' interstate rates and earnings." 9 F.C.C.2d 30, 116 (1967). In its brief in the instant case, the agency said "[t]he fundamental flaw in the carrier parties' arguments in this case is that they either fail or refuse to recognize that the 1976 prescription order altered the normal pattern of carrier initiated rates under the Communications Act." Brief for Respondents at 17. At oral argument, counsel withdrew this statement. In 1987, the FCC states that it first announced the refund policy in 1984, or perhaps as early as 1979 when it issued a notice calling for comments on the subject. Brief for Respondents at 47-48, 48 n. 62, American Telephone and Telegraph Co. v. FCC, Nos. 85-1778, et al. (argued before D.C.Cir. May 21, 1987).
 
 
 56
 Fortunately, an administrative record exists to sort out which of these various arguments were actually set down on paper to guide the conduct of the industry the FCC is charged with regulating.
 
 II. THE RECORD
 
 57
 The FCC in 1984 ordered prospective rate reductions to compensate consumers for revenues earned by AT & T in 1978 based on tariff rates filed in 1976. The majority correctly describes this remedy as a policy of "prospective rate adjustment to compensate for past surpluses." Maj. at 1107. The majority incorrectly describes the remedy as a new policy meeting a novel set of circumstances.
 
 
 58
 FCC policy governing rate-of-return regulation is contained in the administrative rulings pertaining to changes in tariffs for AT & T in 1967, 1969, 1972, and 1976. 9 F.C.C.2d 30 (1967); 21 F.C.C.2d 654 (1969); 38 F.C.C.2d 213 (1972); 57 F.C.C.2d 960 (1976). As I read these decisions, the FCC policy to remedy excessive tariffs consists of the exercise of agency authority at three successive stages: (a) pre-filing establishment of target revenues, (b) post-filing accounting pursuant to section 204 of the Act, 47 U.S.C. Sec. 204, and (c) prospective rate adjustment, up or down, as demanded by the current economic forces in the marketplace. 47 U.S.C. Sec. 205. The coordinated exercise of the agency authority in the first two stages in large measure eliminates the likelihood of overcharges . The option to reset future rates based on then-current conditions provides the vehicle to insure that rates continue to be appropriate over time. As this schema assures adequate protection against excessive charges, the FCC has not been faced by a novel threat. Furthermore, FCC decisions amply document these propositions.
 
 
 59
 In 1967, the FCC adopted a new method for regulating telephone rates. Instead of working from a reconstruction of each cost component incurred by AT & T, a technical and time-consuming nightmare, the FCC settled on a top-down approach based on rate of return. The required rate of return, also known as the cost of capital, is that rate "sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital," balanced against the public interest in just and reasonable rates. 9 F.C.C.2d at 53 (quoting the Supreme Court's "landmark" case, Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed.2d 333 (1944)).
 
 
 60
 Conceptually, the cost of capital is divided into two components: the cost of debt, which is the interest rate enterprises must offer to attract secured funds; and the cost of equity, which is the rate of return investors must be offered to compensate them for the risk of investing in a company's stock. Because investors have numerous alternative investment prospects, the cost of capital approach to ratemaking necessarily focuses on the prospective return demanded by investors for investments of comparable risk. Thus, AT & T's cost of capital will change as necessary to reflect marketplace reassessments of these alternatives. If the rate of return earned by AT & T is set too low, it will not be able to attract either the debt or equity capital necessary to serve current consumers and meet future increases in demand. If set too high, the public interest suffers. See, e.g., 9 F.C.C.2d at 52.
 
 
 61
 Rate regulation thus shifted in 1967 to a two-step process. The FCC would fix the target rate of return, and the carrier would set tariff rates designed to earn this rate of return. In either system, whether before or after 1967, there is the risk of error. In the first, historical costs can be misestimated and long delays and expense incurred in gathering accurate data. In the second, the FCC has recognized, and therefore so must we, that there is an inherent imprecision to measuring the prospective and changing rate of return demanded in the marketplace and a further imprecision in then requiring the carrier to set tariff rates that will produce the exact level of revenues which, after expenses have been deducted and the rate base fixed, will produce the anticipated return. See, e.g., 9 F.C.C.2d at 51-88; 38 F.C.C.2d at 248-51. The so-called "novel circumstance" of a surplus rate of return is in fact a central feature of rate-of-return regulation.
 
 
 62
 Notwithstanding these differences in the approach to setting tariff rates, only the means of regulation changed in 1967, not the basic policy. As noted, the FCC put this point beyond doubt:
 
 
 63
 [T]he policies we are establishing on the basis of the record of this proceeding require no drastic change in any of the standards heretofore applied and represent no new or essentially different approach by this Commission to the regulation of respondents' interstate rates and earnings. On the contrary, the record and our decision confirm the regulatory standards we have generally applied over the years. Thus, prior to 1964, we permitted the respondents to maintain a level of interstate earnings within the range of 7 to 7.5 percent. When the level of earnings tended to exceed this range, we were successful, under our program of continuing surveillance, in negotiating corrective rate adjustments.
 
 
 64
 9 F.C.C.2d at 116.
 
 
 65
 The decision also affirmed that "corrective rate adjustments" would continue to be the mechanism employed to adjust for prior year excesses:
 
 
 66
 As, and when, the going level of respondents' interstate earnings approaches either the upper or lower limits of this [7 to 7.5 percent] range, we will promptly consider what further action may be required in light of then current conditions. This is not to be construed to mean that any future level of earnings which exceeds 7.5 percent or falls below 7 percent will warrant immediate action looking toward rate adjustments. Whether or not remedial action will be required will depend upon all the relevant circumstances obtaining at the time.
 
 
 67
 Id. (emphases added).
 
 
 68
 When read in context, and in light of subsequent decisions, it is evident that "remedial action" contemplated the filing of revised tariff schedules designed to reduce or increase future rates in accordance with the rate of return appropriate to circumstances at that time. The cost of capital approach can make no sense otherwise. Investors lending funds or buying equity always focus on present alternative investments, not prior circumstances.
 
 
 69
 In 1970, AT & T filed a proposal to increase interstate charges on message telephone service by "some $760 million." 38 F.C.C.2d at 215. AT & T estimated the new charges would yield a rate of return approximating 9.5 percent, the rate required by current conditions according to AT & T. In the 1972 proceedings, the FCC specified "a range of 8.5-9.0% as the range of reasonableness for the earnings of Bell on its interstate operations at the tariff rates that we are allowing Bell to file herein." Id. at 245. This is the prospective rate adjustment system in action. Only after evaluating operating results and revenue requirements did the FCC translate the increase in rate of return into a permissible tariff rate increase designed to produce $145 million in incremental revenue. Id. at 248-51. In the decision, the FCC reiterates that adjustments in the system come through prospective adjustments in tariff filings. See id. at 226-27.
 
 
 70
 Last, we reach the 1976 round of increases at issue in this case. AT & T, as usual, initiated the process in 1975 with a proposed $717 million rate increase. The FCC, exercising its prospective powers to control rates, determined the increase would exceed the rate of return then in place, and denied the proposal. 51 F.C.C.2d 619, 626-27 (1975). In other words, the policy functioned in 1976 exactly as designed--it prevented an increase in rates the FCC concluded to be unwarranted by then current conditions as measured by the rate of return.
 
 
 71
 The filing, however, prompted the FCC to investigate and update the rate of return applicable in 1976 from 8.5-9.0 percent to 9.5 percent, plus .5 percent as an efficiency incentive. 57 F.C.C.2d 960, 972-73 (1976). Once again, in accordance with its established practice, the FCC ordered a prospective adjustment in the target increase for revenues. Moreover, by suspending the 1976 tariff filing for one day, the FCC triggered its statutory authority to control rates retroactively pursuant to section 204 of the Act, which states in pertinent part:
 
 
 72
 [U]pon completion of the hearing and decision [the FCC] may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose benefit such amounts were paid, such portion of such charge for a new service or increased charges as by its decision shall be found not justified.
 
 
 73
 47 U.S.C. Sec. 204(a) (1982). Although the agency did not see fit to pursue the section 204 remedy in this case, the essential point in terms of the regulatory regime is that the agency is empowered by the statute to conduct an accounting of actual results and, after a hearing, order a refund if necessary to reimburse consumers who had paid excessive charges.
 
 III. APPLICATION TO RETROACTIVITY
 
 74
 This survey of the relevant FCC decisions compels the conclusion that the FCC's 1984 refund order abruptly reversed its prior policy by basing prospective tariff rates on prior returns in excess of the target levels, instead of on market conditions. Until 1984, the FCC's regulation of AT & T's rates was based exclusively on a foreward-looking assessment of economic conditions. After 1984, the FCC order holds that rates may be reduced to compensate for past experience. The majority neatly encapsulates this abrupt switch by describing the new refund policy as a "prospective rate adjustment to compensate for past surpluses." Maj. at 1107 (emphasis added).
 
 A. Novel Circumstance
 
 75
 The majority seeks to justify the refund policy as a licit response to novel circumstances. In the first instance, this premise of novelty stretches the facts. In 1967, the FCC established a rate of return in the range of 7 to 7.5 percent. Based on this rate, the FCC calculated that AT & T's rates then in place were excessive. The remedy ordered was to reduce future rates to produce a $120 million reduction in revenues. At the new rate level, AT & T would earn the rate of return required by then current conditions. It was never suggested that the return should be lowered by $120 million to reflect current conditions, and then further reduced to collect the past overage. See 9 F.C.C.2d at 116.
 
 
 76
 Likewise, the agency in 1969 determined that actual charges in 1967 exceeded the allowed rate of return. 21 F.C.C.2d at 655. Again, the FCC neither ordered nor contemplated refunds. Rather, it expressed the familiar policy that "when there were departures from this range, [it would] consider the matter in light of conditions obtaining at that time." Id. The FCC thereupon reviewed the excess earnings on the basis of "changes which have taken place since 1967 in the economic, financial, and other conditions that affect AT & T's revenue requirements and its ability to attract new capital"; and concluded that earnings exceeding the 1967 rate of return "[were] not unreasonable." Id. (emphasis added). AT & T was not required to reduce its filed tariffs.
 
 
 77
 The rate-of-return method of regulation was new in 1967, and, according to the majority, the rate-of-return prescription did not fix a maximum cap on the allowable return until 1972. This claim of a major sea-change in the 1972 proceeding is contradicted in the record, see supra at 1114-15, disavowed by the FCC, Brief for Respondents at 19 ("The [1976] rate of return prescription enforced in this case, like every other such prescription the FCC has made, was implemented ... with prospective, binding effect." (footnote omitted)), and unsupported by the Nader decision. See 50 Fed.Reg. at 33,786 n. 1 ("The Nader opinion interpreted prior FCC decisions [back to 1967] as prescribing a rate of return for AT & T...."). In any event, in terms of the assertion of novelty, these are distinctions without a difference. The FCC even in the pre-1967 regime used rates of return to evaluate the revenues allowed after costs. Moreover, the regime between 1967 and 1972 prescribed rates and hence presented the precise issue whether the increment over the targeted rate of return should be retained. Pursuant to the majority's logic, the FCC had the authority to order prospective rate adjustments as the enforcement remedy. The fundamental fact is that the agency twice before explicitly faced the problem of actual charges in excess of the announced range.
 
 
 78
 Second, common sense rebuts the majority's contention. It cannot be argued that the FCC simply failed to anticipate the essential issue of rate regulation, namely, what steps the agency should take to ensure compliance with its rate-of-return orders. In a system of carrier-initiated rates, it is unreasonable to suppose that the agency established the rate-of-return framework without giving a single thought to the prospect of what would happen if the filed tariffs produced a return in excess of the allowed maximum.
 
 
 79
 Finally, the FCC concedes, as it must, that not a single sentence in any report suggested that prospective rate adjustments might be ordered to compensate for past surplus. The omission would be almost inexplicable in a system of rate regulation that inherently can produce errors resulting in overshooting or undershooting the targeted rate of return. The FCC's three coordinate powers, as summarized below, explain the silence that the majority inaccurately construes to be evidence of a novel circumstance.
 
 
 80
 As part of the process setting the rate of return, the FCC approves or disapproves specific requests for target increases in tariff revenues. The revenues analysis is conducted to confirm that AT & T's probable earnings will fall within the range of the targeted rate of return. The agency's advance control over tariff rates minimizes the risk that AT & T will generate unauthorized revenues. The power to call for an accounting and order a refund allows the agency to remedy excessive returns that occur after the fact. Finally, if, as here, rates already approved subsequently produce higher than anticipated returns, the FCC can respond by analyzing present conditions to determine if the higher return is appropriate. If not, the Commission can order the carrier to file reduced tariffs targeted to meet the lower rate of return required by current circumstances.
 
 
 81
 Thus, in the present case, the FCC observed that the tariffs produced a return of 9.25 percent in 1976, confirming that the target limitation on increased revenues operated as anticipated. Hence there was no need to continue the section 204 process. In 1977, the tariffs produced a 9.59 percent return. Only in 1978 did the unchanged tariffs produce the .22 percent surplus.
 
 
 82
 It has taken the agency six years to come to the conclusion that its policy necessarily allows it to reduce future rates to remedy the situation. Based on the policy in effect when AT & T filed its tariffs, however, the FCC should have determined whether the conditions in 1978 and thereafter warranted a prospective reduction in rates. The relevant circumstances for analysis would have included the fact that (1) in an inherently imperfect regime, the excess amounted to less than one-fourth of one percent; (2) the 1976 tariff rates produced a return below 10 percent in every year other than 1978; (3) the rate of return for the entire period 1976 to 1980 averaged 9.69 percent; (4) the governing rate of return was implemented in 1976 based on economic conditions obtaining in 1975; and (5) the relevant period for analyzing prospective rates, if the FCC had acted in timely fashion, would have been in 1979 or soon thereafter.
 
 
 83
 Whatever the outcome of this analysis, the fundamental point is clear. The FCC would have asked whether the overage signaled a need to reset tariff rates based on current conditions. The 1984 order confirms at a minimum that the rate of return established in 1976 continued to apply in 1978. Therefore, had AT & T in fact lowered rates in 1979 in response to the .22 percent excess in 1978, they would have realized a shortfall below even the allowed 10 percent rate of return (i.e., at the unchanged rates, the 1979 annual rate of return was 9.90 percent).
 
 
 84
 In sum, the FCC cannot cite a single passage in its regulatory decisions forecasting the refund policy announced in 1984. See Brief for Respondents at 22-26. The record documents two prior instances in which actual rates exceeded the target rate of return. Most important, the 1984 order--reducing future rates based on past surplus--contradicts the central premise of the FCC's rate-of-return regulation as a forward-looking assessment of capital needs, instead of an historically based estimation of actual costs. In these circumstances, the FCC violated the well-established prohibition against retroactive application of a newly announced policy. See Boston Edison Co. v. FPC, 557 F.2d 845, 849 (D.C.Cir.), cert. denied sub nom. Town of Norwood, Mass. v. Boston Edison Co., 434 U.S. 956, 98 S.Ct. 482, 54 L.Ed.2d 314 (1977); FERC v. Triton Oil and Gas Corp., 750 F.2d 113, 116 (D.D.Cir.1984).
 
 B. Reliance
 
 85
 The prohibition applies with special force when, as here, the party subject to the change has relied to its detriment on the prior policy. Whereas the majority is unable to find any such reliance, I believe the reliance is self-evident. Prior to today's ruling, AT & T had every reason to believe that section 204 provided the only statutory mechanism for ordering a retroactive refund. The FCC concedes that this section does not apply here. Therefore, the only other provision that could arguably provide such authority, section 4(i) aside,[1] is the section 205 authority to set "just and reasonable [rates] ... to be thereafter observed," 47 U.S.C. Sec. 205(a) (emphasis added); cf. the regulatory analog in section 206 of the Federal Power Act, 16 U.S.C. Sec. 824e(a), and section 5 of the Natural Gas Act, 15 U.S.C. Sec. 717d(a).
 
 
 86
 By long-established principle, these three parallel statutory provisions "bar[ ] utility refunds for past excessive rates, or the Commission's retroactive substitution of an unreasonably high or low rate with a just and reasonable rate." City of Piqua, Ohio v. FERC, 610 F.2d 950, 954 (D.C.Cir.1979); Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 578, 101 S.Ct. 2925, 2931, 69 L.Ed.2d 856 (1981); Indiana & Michigan Elec. Co. v. FPC, 502 F.2d 336, 345 (D.C.Cir.1974), cert. denied, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975). While the majority finds that section 4(i) could support the particular remedy ordered here in the future, it is evident that prior to this ruling AT & T could reasonably have believed that sections 204 and 205, and the analogs in the electric and gas industry, contained the relevant statutory framework. As the FCC concedes, see AT & T Earnings on Interstate and Foreign Services During 1978, 49 Fed.Reg. 49,502, 49,507 (1984), and the panel holds, maj. at 14, this framework provides no authority for the 1984 refund order.
 
 
 87
 The majority believes AT & T should have foreseen the true novelty here, namely, the location of refund power in the section 4(i) authorization to perform such acts "as may be necessary in the execution of its function." 47 U.S.C. Sec. 154(i). This first use of section 4(i) to authorize the 1984 refund does not void the FCC's construction of the statute. Bankamerica Corp. v. United States, 462 U.S. 122, 131, 103 S.Ct. 2266, 2272, 76 L.Ed.2d 456 (1983) ("[a]uthority actually granted by Congress ... cannot evaporate through lack of administrative exercise." (quoting FTC v. Bunte Bros., Inc., 312 U.S. 349, 352, 61 S.Ct. 580, 582, 85 L.Ed. 881 (1941))). It does mean, however, that persons subject to enforcement proceedings can reasonably rely "on what was universally perceived as plain statutory language," id. at 133, 103 S.Ct. at 2273, or, as here, the plain statutory scheme. See National Classification Comm. v. United States, 746 F.2d 886 (D.C.Cir.1984) (agency cannot retroactively expose carriers to antitrust liability for reasonable reliance on a settled prior construction of an agreement).
 
 
 88
 Other factors independently demonstrate AT & T's reliance. Absent notice of the refund policy, the carrier went five years without a change in its tariff even though it could have increased its revenues in every year except 1978 without exceeding the 10 percent rate of return limit. The increased revenues would have more than offset the $101 million rate reduction ordered here. Moreover, although the agency in 1984 held that conditions in 1978 fell "within the correlative range of economic and financial market conditions," considered in 1976, 49 Fed.Reg. at 49,506 n. 34, a quick perusal of the FCC opinions fixing the appropriate rate of return in a given period indicates the subject admits to less than scientific certainty. For example, the decisions document the multiple assumptions used to compile this deceptively simple rate-of-return figure and the multiple underlying debates among economists over the proper measurement of the cost of debt and equity. See, e.g., 9 F.C.C.2d at 72-86; 38 F.C.C.2d at 226-46; 57 F.C.C.2d at 962-72.
 
 
 89
 In this context, the FCC's post-hoc determination in 1984 that 1976 economic conditions still prevailed in 1978 does not mean the agency would have necessarily rejected a .22 percent increase in the allowable rate of return if vigorously pressed and documented at the time by AT & T. With such large sums of money at stake, I believe the majority is unduly formalistic when it asserts as fact that AT & T would not have behaved any differently even with explicit knowledge that a .22 percent overshoot in its calculated rate of return would produce a $101 million refund order.
 
 C. Inherent Remedy
 
 90
 A final justification relied upon by the FCC, see Brief for Respondents at 23, and the majority, maj. at 1109, is that the rate-of-return prescription inherently encompasses the remedy of setting a rate of return appropriate to say 1985, but then reducing that rate by a fixed sum (here $101 million plus $77 million in interest) to adjust for past surplus. FCC practice has been otherwise. FCC decisions describe a contrary system. No other regulators have seen fit to follow this system. Indeed, the FCC only began using the word "prescription" in 1973, in a discussion to which it attached no special significance, six years after adopting a policy that "represent[s] no new or essentially different approach" to rate regulation. 9 F.C.C.2d at 116. See 42 F.C.C.2d 293, 300 (1973); 51 F.C.C.2d at 625 n. 12. To the extent the word has application here, it is to signify that the rate of return prescribes the allowable rate of return. This court said no more in Nader v. FCC, 520 F.2d 182 (D.C.Cir.1975). Now the FCC claims long after the fact that a prescriptive rate-setting regime silently conveys the additional prospect of an enforcement policy reducing prospective rates to remedy past surplus. In these circumstances and in light of the FCC's insistence that rates relate exclusively to current conditions, I believe the Supreme Court has pronounced decisively. The 1984 enforcement scheme "is too unprecedented a departure from the conventions of ratemaking to rest on mere inference." Transcontinental & Western Air, Inc. v. CAB, 336 U.S. 601, 607, 69 S.Ct. 756, 759, 93 L.Ed. 911 (1949).
 
 D. The Rulemaking Order
 
 91
 The posture of this case would be substantially altered if the FCC were arguing its right to engage in rulemaking in an adjudicatory setting. Yet here we have the anomalous circumstance that the refund order directed at AT & T was expressly a single party adjudication. See supra at 1112. The subsequent decision to engage in prospective rulemaking conclusively establishes that the FCC has no statutory interest in the outcome of this particular case. Cf. Triton Oil, 750 F.2d at 116 ("The Commission may not abuse its discretion by arbitrarily choosing to disregard its own established rules and procedures in a single, specific case."). In the context of Retail, Wholesale, the substantive rationale for allowing retroactive rulemaking is sharply diminished.
 
 
 92
 Moreover, pursuant to the actual rules adopted, AT & T would most likely not be liable for a "refund" in the instant case. Specifically, the Commission, in its preliminary rulemaking, recognized the "inability of carriers 'to target their earnings with precision' as a result of 'unpredictable factors.' The Commission recognized that 'disallowing any earnings 'peaks,' while ignoring the 'valleys,' would tend to induce a systematic bias that would cause a carrier to fall short of its targeted rate of return over the long run.' " Brief for Respondents, Nos. 85-1778, et al. at 11 (citations to record omitted) (emphasis added).
 
 
 93
 The final rules establish several specific provisions to deal with the inherent fluctuation in return, i.e., the precise issue of this case. See id. at 31-34. Significantly, the measuring period for the return is two years, not one. AT & T earned 9.59 percent in 1977 and 10.22 in 1978, which produces a two-year average return of 9.91 percent. Moreover, the two-year provision allows for "mid-course corrections, thereby lessening the possibility that the enforcement mechanism would have to be invoked." Id. at 13 (citations to record omitted). AT & T, of course, was given no such opportunity to make corrections in the present case. Indeed, it is startling that under the new rules, AT & T is expressly allowed to file increases if actual earnings are below the prescribed return during the first year. Id. at 33. Had AT & T been allowed the benefit of this procedure, it could have raised rates in 1976 (9.25 percent actual), 1977 (9.59 percent), 1979 (9.90 percent), and 1980 (9.90 percent) and still been below the allowable ten percent ceiling. With perfect targeting, AT & T would have earned an additional 1.36 percent, less the .22 percent surplus in 1978 for a net gain of 1.16 percent. If a .22 percent overcharge resulted in a $101 million refund order, AT & T actually could have charged approximately an additional half-billion dollars during this period without violating the established, lawful rate of return.
 
 IV. CONCLUSION
 
 94
 The FCC has the statutory authority to insure that actual rates filed are likely to fall within the required range (by targeting the allowable revenue increment pursuant to section 205), and that the rates in fact do fall within the range (via a section 204 accounting). Over time the FCC can force prospective adjustment in rates by lowering or raising the allowed rate of return, as required by current economic conditions. Notwithstanding this comprehensive program, the majority credits the FCC with a policy that cannot be found in the record. The opinion further ignores the carrier's reliance upon the statutory refund scheme as it existed in 1978, and rejects outright the prospect that hundred million dollar refund orders would sharpen the carrier's interest to earn all revenues to which it was entitled. Finally, the majority ignores the implications of the FCC's subsequent decision to engage in formal rulemaking. Application of well-established retroactivity doctrine requires that the 1984 Refund Order be set aside. I respectfully dissent.
 
 
 
 *
 Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 "The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." 47 U.S.C. Sec. 154(i) (1982)