**ACS OF ANCHORAGE, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**General Communication, Inc., Intervenor.**

**No. 01–1059.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 4, 2002.

Decided May 21, 2002.

---

Richard P. Bress argued the cause for petitioner. With him on the briefs were Karen Brinkmann and Richard R. Cameron.

Jeffrey J. Peck and David W. Zesiger were on the brief for amicus curiae Independent Telephone and Telecommunications Alliance in support of petitioner. Lewis A. Tollin entered an appearance.

John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Laurel R. Bergold, Counsel, Federal Communications Commission, and Charles A. James, Assistant Attorney General, and Robert B. Nicholson and Robert Wiggers, Attorneys, U.S. Department of Justice. Laurence N. Bourne, Counsel, Federal Communications Commission, entered an appearance.

Joe D. Edge argued the cause and filed the brief for intervenor General Communication, Inc. With him on the brief were Tina M. Pidgeon and Kathleen S. O'Neill.

Before: EDWARDS and RANDOLPH, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Senior Circuit Judge:

Petitioner ACS of Anchorage, Inc. challenges a Federal Communications Commission order finding that ACS exceeded its permissible rate of return for 1997–98. As a remedy, the Commission ordered ACS to pay damages plus prejudgment interest to a complaining customer, General Communications, Inc. ("GCI"). See *In re General Communication, Inc. v. Alaska Communications Systems Holdings, Inc.*, Memorandum Opinion and Order, FCC 01–32, at 2, ¶ 1 (Jan. 24, 2001) ("Order"); *id.* at 31, ¶ 77. ACS poses three claims. First, it says that the Commission erroneously required it to allocate to its intrastate services the traffic-sensitive costs associated with calls to internet service providers ("ISPs"). Second, it argues that even if the Commission were right on that issue, ACS's filing of tariffs under 47 U.S.C. § 204(a)(3), a provision for "streamlined tariffs," barred any damages

for overcharges for the period those tariffs were in effect, namely calendar year 1998. See *In re Implementation of Section 402(b)(1)(A) of the Telecommunications Act of 1996,* Report and Order, 12 FCC Rcd 2170 (1997) ("Streamlined Tariff Order"). Third, as to any damages that were due, ACS challenges the rate chosen by the FCC for calculating prejudgment interest. We deny ACS's petition on the first issue, grant its petition on the second, and remand for further proceedings on the third.

\* \* \*

ACS is the incumbent local exchange carrier ("LEC") in Anchorage, Alaska. Order at 3, ¶ 4. As a "rate-of-return" carrier (i.e., one whose rates are limited in terms of the rate of return rather than via price caps, see 47 C.F.R. § 65.1(b)), ACS files tariff rates for a two-year period, 47 C.F.R. § 69.3(a); the rates must be chosen with a view to yielding a rate of return no greater than the Commission-prescribed maximum. See *In re Amendment of Parts 65 and 69 of the Commission's Rules to Reform the Interstate Rate of Return Represcription and Enforcement Processes,* 10 FCC Rcd 6788, 6791–94, ¶ ¶ 7–12, 6847–48, ¶ 135 (1995). In addition, such carriers periodically submit monitoring reports showing their actual rates of return. 47 C.F.R. § 65.600. These reports may lead carriers to file revised rates, see 47 C.F.R. § 69.3(b), or cause the Commission to start proceedings under 47 U.S.C. § 205 to prescribe new rates "to be thereafter followed."

Three tariff filings by ACS are pertinent. In April 1996 it filed tariff rates for the two-year period from July 1, 1996 to June 30, 1998 (the "1997 Tariff"), and in December 1997 a "mid-course correction" tariff covering the balance of that period (January 1, 1998 to June 30, 1998) (the "January 1998 Tariff"). See 47 C.F.R. § 69.3(b) (permitting mid-course corrections); *Southwestern Bell Telephone Co. v. FCC,* 10 F.3d 892, 893–94 & n. 1 (D.C.Cir. 1993) (describing use of mid-course corrections). ACS filed the January 1998 Tariff under the streamlined tariff provisions of 47 U.S.C. § 204(a)(3), which in this instance required a 15-day notice period. Order at 4, ¶ 8. During this notice period, apparently, the Commission took no action to suspend the tariffs and initiate a hearing on the rates, see 47 U.S.C. § 204(a)(3) (cross-referencing 47 U.S.C. § 204(a)(1)), and the tariffs went into effect without any hearing being ordered.

In June 1998, ACS filed its rates for the two-year period from July 1, 1998 to June 30, 2000 (the "July 1998 Tariff"), also pursuant to the streamlined tariff provisions. The July 1998 Tariff, however, allocated to ACS's interstate service the traffic-sensitive switching costs associated with ISP calls. Order at 5, ¶ 9. Previously, ACS had treated ISP calls as *intra*state. See *id.* at 5, ¶ 8 & n. 18; see also ACS Br. at 15. This accounting change had the effect of increasing ACS's reported interstate costs, thereby making its expected rate of return lower than it otherwise would have been. See Order at 17, ¶ 39. Again, however, the Commission took no action during the notice period, and the tariffs went into effect without any hearing being ordered.

In September 1999, ACS filed its final monitoring report for the two-year period from January 1, 1997 to December 31, 1998.[1] The report continued to classify

---

**1.** Commission regulations specify two-year monitoring reports running with the calendar year, even though the tariffs are filed for

periods starting July 1. Compare 47 C.F.R. § 69.3(a) (specifying periodicity for rate-of-return monitoring reports), with 47 C.F.R.

ISP-related traffic as interstate. Anchorage Telephone Utility, Rate of Return Report (Sept. 30, 1999); Order at 6, ¶ 11. Had ISP costs been classified as intrastate, ACS's cumulative rate of return would have been 26.66% or 32.12% (depending on other accounting practices not challenged here), see Order at 6, ¶ 12; Responses of Alaska Communications Systems Holding, Inc. and ACS of Anchorage, Inc. to Interrogatories, *In re General Communication, Inc. v. Alaska Communications Systems Holdings Inc.*, File No. EB–00–MD–016, at ex. 1 (Oct. 20, 2000), well in excess of the prescribed maximum rate of return of 11.65%, see *In re Prescribing the Authorized Rate of Return for Interstate Services of Local Exchange Carriers*, 5 FCC Rcd 7507, ¶ 1 (1990) (prescribing maximum rate of return of 11.25%); 47 C.F.R. § 65.700(a) (stating that maximum allowable rate of return for any access service category is the prescribed rate of return plus 0.4%).

In August 2000, GCI filed a complaint with the Commission alleging that ACS had improperly calculated its interstate costs by treating ISP calls as interstate, and had violated its prescribed rate of return during the 1997–98 monitoring period. Order at 6–7, ¶ 13. The Commission agreed with GCI, *id.* at 10, ¶ 22, 20, ¶ 48, and ordered ACS to pay damages of about $2.7 million plus prejudgment interest assessed at the Internal Revenue Service's corporate overpayment rate, *id.* at 31, ¶ 77.

Petitioning for review, ACS challenges the Commission's classification of ISP calls, its failure to treat the § 204(a)(3) tariff filings as a bar to damages for 1998, and the rate selected for prejudgment interest.

\* \* \*

■■■ *ISP calls classification.* Because the same telecommunications equipment is often used for both intrastate and interstate communications, carriers must apportion their costs (for regulatory purposes) through what is called the "separations" process. See generally 47 C.F.R. §§ 36.1–36.3. ACS argues that because FCC has previously recognized ISP calls as interstate for jurisdictional purposes under its "end-to-end" analysis, e.g., *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 14 FCC Rcd 3689, 3695–3703, ¶¶ 10–20 ("Reciprocal Compensation Order"), ISP calls should be interstate for separations purposes as well.

Of course, generally speaking, separations will follow jurisdiction. This basic norm is inherent in the separations formulas found at 47 C.F.R. § 36.125(a)(3), (a)(5) & (b), the Supreme Court's decision in *Smith v. Illinois Bell Tel. Co.*, 282 U.S. 133, 150–51, 51 S.Ct. 65, 69–70, 75 L.Ed. 255 (1930), and our decision in *MCI Telecommunications Corp. v. FCC*, 750 F.2d 135, 137, 140–41 (D.C.Cir.1984). But practical considerations may justify divergent treatment—at least temporarily. See *Smith*, 282 U.S. at 150, 51 S.Ct. at 69 (recognizing the "practical difficulty of dividing the property between interstate and intrastate services" and requiring "only reasonable measures" for separation). Indeed, in *MCI*, we explicitly upheld a deviation from the jurisdictional norm where the Commission was implementing (a) an interim ratemaking solution (b) justified by a substantial policy objective. *MCI*, 750 F.2d at 140–41.

While the Order does not explicitly invoke the *MCI* exception, we can reasonably discern the path from its reasoning and citations. See *Bowman Transportation, Inc. v. Arkansas-Best Freight Sys-*

§ 65.701 (specifying periodicity for rate-of- return monitoring reports).

*tem, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974); *Syracuse Peace Council v. FCC,* 867 F.2d 654, 665 (D.C.Cir.1989). The interim nature of the decision is quite explicit—and, of course, a natural concomitant of the novelty of the internet itself. Compare, e.g., *WorldCom v. FCC,* No. 01–1218, 2002 WL 832541 (D.C.Cir. May 3, 2002). As the Order explains, the Commission views its treatment of ISP calls as derivative of its policy exempting ISPs and other enhanced service providers ("ESPs") from paying interstate "access" charges—the charges normally paid by an interexchange carrier ("IXC") such as AT&T and MCI for access to the LECs originating and terminating an interexchange call. Order at 8, ¶ 17, 14, ¶ 32. Insofar as the ESP exemption is clearly temporary, it follows that the intrastate classification would be as well. See, e.g., *id.; In re Amendments of Part 69 of the Commission's Rules Relating to the Creation of Access Charge Subelements for Open Network Architecture,* Report and Order, 6 FCC Rcd 4524, 4535, ¶ 60 (1991) ("ONA Order") (retaining exemption temporarily to provide stability during open tariff architecture reforms); *In re Amendments of Part 69 of the Commission's Rules Relating to Enhanced Service Providers,* 3 FCC Rcd 2631, 2631 ¶ 2 (1988) ("ESP Exemption Order") (characterizing ESP exemption as a temporary measure to avoid "unduly" burdening the ISP industry). Furthermore, recent letters issued by the Commission's Common Carrier Bureau explicitly note that the intrastate classification "is an interim measure only." *Common Carrier Bureau Issues Letter to Bell Atlantic Regarding Jurisdictional Separations Treatment of Reciprocal Compensation for Internet Traffic,* Public Notice, 14 FCC Rcd 13148, 13148 (1999); see also *Common Carrier Bureau Issues Letter to SBC Regarding Its Jurisdictional Separations Treatment of Internet*

*Traffic,* Public Notice, 14 FCC Rcd 8178, 8180 n.9 (1999).

The Commission's primary policy justification for the intrastate classification matches the language it has used for the ESP exemption. Rather than directly exempting ESPs from interstate access charges, the Commission defined them as "end users"—no different from a local pizzeria or barber shop. See Order at 16, ¶ 37; *In re Amendments of Part 69 of the Commission's Rules Relating to the Creation of Access Charge Subelements for Open Network Architecture,* Notice of Proposed Rulemaking, 4 FCC Rcd 3983, 3988, ¶ 39 & n.89 (1989) ("ONA NPRM"); see also 47 C.F.R. § 69.2(m). While this categorization exempted ISPs from interstate access charges paid by IXCs, it left them obliged to purchase access through intrastate tariffs—namely, local business line charges. The Commission contends that ACS's allocation of ISP costs to interstate service would thus create a cost-revenue mismatch. Order at 14–16, ¶¶ 32–37. The tariff revenue would be allocated to intrastate and the costs to interstate, disrupting rate-of-return calculations.

Once the Commission has allotted the *revenue* to intrastate service, plainly it makes sense to allocate the costs there as well. But that might be said merely to relocate the question: as the functional significance of the ESP exemption is to channel the revenue to intrastate service, one might ask if such an allocation was reasonable. Indeed, ACS's brief addresses the cost-revenue matching principle in *economic* terms, i.e., the proposition that, in the interest of aligning incentives correctly, costs should be borne by the customers who cause them to be incurred. See *Union Elec. Co. v. FERC,* 890 F.2d 1193, 1198 (D.C.Cir.1989). Noting that in creating the ESP exemption the Commission had recognized that it would cause

economic distortions, making non-ESP users of interstate access bear disproportionate costs, ACS argues that the Commission cannot now rely on the cost-revenue matching principle. See ACS Br. at 34 (citing ESP Exemption Order, 3 FCC Rcd at 2631, ¶ 2). But the Commission *needn't* rely on the economic cost-revenue principle. All it invokes is a more modest principle of regulatory orderliness. And because we must take the ESP exemption as given, with its concomitant potential for economic distortions, the principle of regulatory orderliness indeed supports the Commission.

We are left, then, with the Commission matching its separations treatment of costs for ISP-bound calls with its classification of those calls for tariffing and revenue purposes. Further, not only is the latter unchallenged here, but the Commission appears to be working on a number of interconnected parts of the puzzle. The ESP exemption itself is temporary. And the Commission has set out to reform the regime to which it is an exception, the regime of interstate access charges, see Order at 14, ¶ 32; *In re Access Charge Reform*, First Report and Order, 12 FCC Rcd 15982, 16133, ¶ 345 (1997), and is investigating future regulatory schemes for ISPs, *In re Usage of Public Switched Network by Information Service and Internet Access Providers*, Notice of Inquiry, 11 FCC Rcd 21354, 21490–93, ¶ ¶ 311–18 (1996). Further, it is fundamentally rethinking the separations process in light of ISPs and other market changes. *In re Jurisdictional Separations Reform and Referral to the Federal–State Joint Board*, Notice of Proposed Rulemaking, 12 FCC Rcd 22120 (1997); see also *Report Filed by State Members of Joint Board of Jurisdictional Separations*, Public Notice, 14 FCC Rcd 3482 (1999). Clearly, as we stated in *MCI*, the Commission is entitled to substantial deference "when it acts to maintain the status quo so that the objectives of a pending rulemaking proceeding will not be frustrated," *MCI*, 750 F.2d at 141, including the objective of implementing large-scale revisions "in a manner that would cause the least upheaval in the industry," *id.* Accordingly, we cannot find the Commission's interim intrastate classification of ISP-related costs to be arbitrary or capricious.

\* \* \*

*Damages for rates filed in "streamlined tariffs".* ACS next argues that 47 U.S.C. § 204(a)(3), as elaborated upon by the Commission in its Streamlined Tariff Order, is a bar to damages for its purported overcharges in 1998. 47 U.S.C. § 204(a)(3), part of the Telecommunications Act of 1996, states:

A local exchange carrier may file with the Commission a new or revised charge, classification, regulation, or practice on a streamlined basis. Any such charge, classification, regulation, or practice shall be *deemed lawful* and shall be effective 7 days (in the case of a reduction in rates) or 15 days (in the case of an increase in rates) after the date on which it is filed with the Commission unless the Commission takes action under paragraph (1) before the end of that 7–day or 15–day period, as is appropriate.

*Id.* (emphasis added).

 The terms "legal" rate and "lawful" rate come to us burdened with (or illuminated by) the Supreme Court's decision in *Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway Co.*, 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932), as the Commission recognized in its Streamlined Tariff Order, 12 FCC Rcd at 2181–82, ¶ ¶ 19–20 & nn. 62, 65. "Legality" mainly addresses procedural validity.

"[T]o render rates definite and certain, and to prevent discrimination and other abuses," rates must be filed and published, and deviation from published rates is subject to criminal and civil penalties. *Arizona Grocery,* 284 U.S. at 384, 52 S.Ct. at 184. A particular rate thus becomes "legal" when it is filed with an agency and becomes effective. But a rate's legality is not enough to establish its substantive reasonableness or "lawfulness." See *id.* (noting that a rate's legality does not abrogate "the common-law duty to charge no more than a reasonable rate"). A carrier charging a merely *legal* rate may be subject to refund liability if customers can later show that the rate was unreasonable. *Id.* Should an agency declare a rate to be *lawful,* however, refunds are thereafter impermissible as a form of retroactive ratemaking. See *id.* at 387–89, 52 S.Ct. at 185–86.

 Informed by this dichotomy, the Commission in its Streamlined Tariff Order interpreted the "deemed lawful" language in § 204(a)(3) as "establish[ing] a conclusive presumption of reasonableness." Streamlined Tariff Order, 12 FCC Rcd at 2181–82, ¶ 19. Therefore, "a streamlined tariff that takes effect without prior suspension or investigation is conclusively presumed to be reasonable and, thus, a lawful tariff during the period that the tariff remains in effect." *Id.* at 2182, ¶ 19. In accordance with *Arizona Grocery,* these "deemed lawful" tariffs are not subject to refunds. If a later reexamination shows them to be unreasonable, the Commission's available remedies will be prospective only. *Id.* at 2182–83, ¶¶ 20–21. As the Commission emphatically recognized, § 204(a)(3) effected a considerable change in the regulatory regime: before, tariffs that became effective without suspension or investigation were only legal (not conclusively lawful), and thereby remained

subject to refund remedies. *Id.* at 2176, ¶ 8 (describing no-refund rule as differing "radically" from past practice); *id.* at 2182–82, ¶ 20 (describing previous practice).

 Clearly then, to the extent that the streamlined tariff provisions apply to ACS tariff filings, the Commission may not now impose refund liability for covered rates—even ones it concludes were unreasonable. The Commission, however, argues that the streamlined tariff provisions do not apply.

First it asserts a critical distinction between rates and rates of return. Order at 23, ¶ 57. It claims that since the Order found ACS in violation of its prescribed *rate of return,* the fact that ACS's *rates* might have been deemed lawful under § 204(a)(3) does not immunize it from refund liability. In support, the Commission relies on *New England Telephone and Telegraph Co. v. FCC,* 826 F.2d 1101 (D.C.Cir.1987), in which we upheld the Commission's use of a refund remedy for violations of prescribed rates of return. *Id.* at 1109; see also *MCI Telecommunications Corp. v. FCC,* 59 F.3d 1407, 1413 (D.C.Cir.1995). Since neither § 204(a)(3) nor the Streamlined Tariff Order directly addressed the issue of rate-of-return violations, the Commission contends that the "long-standing rules concerning liability for rate-of-return violations" should be left unscathed. Order at 25, ¶ 59.

The Commission's position, however, overlooks the language of its statutory mandate. Under the Communications Act of 1934, it is empowered to ensure just and reasonable rates ("charges"), not rates of return. See 47 U.S.C. § 201(a). The Commission acquires the authority to prescribe rates of return only as a means to achieve just and reasonable rates. See *Nader v. FCC,* 520 F.2d 182, 203 (D.C.Cir. 1975). As we explained in *Nader,* rates of

return are but one element in the task of ratemaking, but the Commission can prescribe them—sometimes in separate phases from the other necessary elements—if doing so will help the Commission "carry out its functions in an expeditious manner." *Id.* at 204. Over the years, rate-of-return violations have developed into proxies for finding rates unreasonable. *MCI,* 59 F.3d at 1414 (noting that the Commission may "treat a violation of [a rate-of-return] prescription as a *per se* violation of the requirement ... that a common carrier maintain 'just and reasonable' rates"). But we have never suggested that rates of returns could be ends in themselves, rather than means to the end of reasonable rates.

Here, of course, no proxy for (un)reasonableness is needed. Since § 204(a)(3) deems ACS's rates to be lawful, the inquiry ends. This situation is quite different from *New England Telephone,* which was decided before the passage of § 204(a)(3). In that case, the carrier's rates had gone into effect with neither a Commission finding of reasonableness, 826 F.2d at 1105, which under *Arizona Grocery* would *bar* refunds, nor a suspension of the rates and initiation of a hearing, for which § 204(a) (a precursor to the current § 204(a)(1)) specifically *allowed* refunds. Section 204 as it then read was silent as to the permissibility of refunds where the Commission simply allowed the company's filed rate to go into effect without suspension or initiation of a hearing, and in effect *New England Telephone* read the silence as permitting the Commission to order refunds (in certain circumstances). For the cases covered by § 204(a)(3), Congress has now broken the silence.

Recall that the Streamlined Tariff Order read § 204(a)(3)'s "deemed lawful" language to create a conclusive bar to refunds. 12 FCC Rcd at 2175–76, ¶¶ 8–9,

2181–82, ¶¶ 18–19. In doing so, it reasoned that "deemed lawful" was "unambiguous" in the "consistent" interpretation of the courts. *Id.* at 2181–82, ¶ 18; see also, e.g., *Ohio Power Co. v. FERC,* 954 F.2d 779, 783 (D.C.Cir.1992) (discussing "deemed" as establishing a conclusive presumption); *H.P. Coffee Co. v. Reconstruction Finance Corp.,* 215 F.2d 818, 822 (Emer. Ct.App.1954) (reporting "almost unanimous judicial determination that the word ['deemed'], when employed in statutory law, creates a conclusive presumption"). This being so, and bearing in mind that Commission control over the rate of return is under the statute merely a tool for determining the reasonableness of *rates,* see 47 U.S.C. § 201, we find § 204(a)(3) equally unambiguous in barring refunds purportedly for rate-of-return violations.

The Commission next suggests that § 204(a)(3) does not protect the January 1998 Tariff from refunds because neither of the two challenged cost allocation practices appeared in that filing. Order at 23, ¶ 56. (Apparently, the earliest public disclosure was a March 1998 preliminary monitoring report, see Anchorage Telephone Utility, Rate of Return Report (Mar. 31, 1998); Order at 5, ¶ 9.) Accordingly, the Commission contends that these " 'practices' were not 'filed' in [ACS's] January 1998 Tariff in accordance with section 204(a)(3)." Order at 23, ¶ 56. We find this argument somewhat mystifying. By the Commission's own account, the methods used in the January 1998 Tariff were the proper ones. Surely the Commission cannot now criticize ACS for failing to use in January 1998 the new accounting methods that the Commission maintains are impermissible and which ACS had not yet adopted.

Alternatively, the Commission may be claiming that ACS's changes in computa-

tion, implemented between the January 1998 Tariff and the July 1998 Tariff, were changes in "practices" within the meaning of § 204(a)(3) (authorizing filing of "a new or revised charge, classification, regulation, or practice"), so that ACS's failure to file a tariff announcing the computational change nullified any right of ACS to rely on the previously filed January 1998 Tariff. But we see no basis for understanding § 204(a)(3)'s word "practice" to include internal computations underlying a rate. The Streamlined Tariff Order expressly addresses filings that are hard to classify as rate reductions or rate increases (thus entailing 7- or 15-day waiting periods), and reads the 15-day language of § 204(a)(3) broadly as covering any non-rate change in "terms and conditions" or even introduction of new service; yet it nowhere suggests that any of the words used by § 204(a)(3) encompasses purely internal changes in computation, as opposed to terms or conditions of service, which, like rate changes, are directly experienced by customers. See 12 FCC Rcd at 2200–03, ¶¶ 62–68.

The Commission may have been confused by its pre-§ 204(a)(3) habit of retroactively assessing the lawfulness of a rate long after it had taken effect without advance suspension or initiation of hearing. See FCC Br. at 40. As we noted in our 1995 *MCI* decision, it is virtually impossible to tell in advance just what rate of return a given rate may yield. 59 F.3d at 1415–16. In a world where the lawfulness of a rate is in almost endlessly suspended animation, the Commission may understandably feel entitled to receive ongoing updates of a company's calculations showing the links between its rates and its rate of return. But that is not the world of § 204(a)(3), where the rate itself, if filed and not suspended, is "deemed lawful."

We do not, of course, address the case of a carrier that furtively employs improper accounting techniques in a tariff filing, thereby concealing potential rate of return violations. The Order here makes no claim of such misconduct.

■ Finally, the Commission argues that § 204(a)(3) does not protect the July 1998 Tariff because ACS failed to satisfy the statutory notice period. Order at 23, ¶ 54. ACS filed the July 1998 Tariff on 7-days notice. The Commission contends that because the Tariff changed accounting methods, it altered "terms and conditions," and thus had to be filed on 15-days notice. Order at 25–26, ¶¶ 61–63; see also Streamlined Tariff Order, 12 FCC Rcd at 2203, ¶ 68 (discussing treatment of "tariffs that change terms and conditions or apply to new services even where there is no rate increase or decrease"). Again, nothing in the statute or even the Streamlined Tariff Order supports the classification of a filing that changes only underlying calculations as an "increase in rate" requiring 15-days notice.

We note that since § 204(a)(3) immunizes ACS's rates for 1998, it is unclear how its rate of return should be calculated for 1997 in light of *Virgin Islands Telephone Corp. v. FCC*, 989 F.2d 1231 (D.C.Cir. 1993). In *Virgin Islands* we held that the Commission could not evaluate a carrier's rate-of-return using a period different from the two-year period the Commission had itself prescribed. *Id.* at 1238 (holding invalid Commission use of a six-month monitoring period). But there the truncation of the two-year period was at the instigation of the Commission, while here it is a result of ACS's use of § 204(a)(3). As the Commission has not yet had the opportunity to address rate of return violations for a period cut short in this fashion, we express no opinion and remand the

case to the Commission for its consideration of the issue.

\* \* \*

*Prejudgment Interest.* ACS lastly argues that the Commission erred in using the IRS's rate for corporate overpayment for the calculation of prejudgment interest. ACS contends that it should instead have used the rate for "large" corporate overpayments. See Order at 29–30, ¶ ¶ 72–74.

 Under 26 U.S.C. § 6621, the IRS calculates five rates of interest, all functions of the Treasury's rate for short-term borrowing. The rates depend on whether taxes are overpaid or underpaid, whether the party is an individual or a corporation, and whether the amount is "large" (exceeds $10,000). See 2002–12 I.R.B. 637, 638–43 (2002). The Commission apparently co-opts these rates for the calculation of prejudgment interest. The following, for example, are the rates for January 1, 1999 to March 31, 1999, the first period of prejudgment interest charged against ACS:

Noncorporate over- and underpayment: 7%

Corporate overpayment: 6%

Large corporate overpayment: 4.5%

Corporate underpayment: 7%

Large corporate underpayment: 9%

*Id.*

 The Commission found that the rate for non-large corporate overpayments was most appropriate because it was "the overpayment rate that the Commission has most recently applied, despite the apparent availability of the rate for large corporate overpayments." Order at 30, ¶ 74. The precedents offered by the Commission generally support this position. See *In re Time Warner Entertainment/Advance–Newhouse Partnership,* 14 FCC Rcd 9149, 9154 n. 36 (1999); *In re Section 208 Complaints Alleging Violations of the Commis-*

*sion's Rate of Return Prescriptions,* 12 FCC Rcd 4007, 4020–21 app. B (1997). The *Ameritech* case, in which the FCC held that the appropriate interest rate was the *individual* overpayment rate (as opposed to the *corporate* overpayment rate) is somewhat anomalous, but in any case offers no support for ACS's proposed use of the large corporate overpayment rate. See *In re Long–Term Telephone Number Portability Tariff Filings of Ameritech Operating Companies, et al.,* 14 FCC Rcd 17,339, ¶ ¶ 1, 4 (1999). Indeed, ACS presents no cases in which the Commission has ever applied the large corporate overpayment rate. See Order at 30 n. 160.

Fair enough. But the Commission acknowledged the possibility of applying the large corporate overpayment rate, in words contradicting its prior simple reasoning from precedent:

> Although we might appropriately apply the rate for large corporate overpayments exceeding $10,000 when a defendant has simply miscalculated revenue or demand and accidently exceeded its rate of return, such is not the case here.

Order at 30, ¶ 74. The Commission went on to justify the higher rate by arguing that ACS "had at least constructive knowledge" of the intrastate classification rule because "the Commission had rejected other carriers' attempts to assign ISP traffic to the interstate jurisdiction." *Id.* But those rejections happened in 1999, well after ACS filed its 1997 tariffs. See *id.* at 30 n. 161 (cross-referencing *id.* at 9–10, ¶ 21). And while the rejections did occur before ACS filed its 1997–98 Monitoring Report in September 1999, it is unclear why a company's acquisition of "constructive knowledge" of Commission views *after* its collection of disputed rates should affect its culpability for that collection.

As the Commission alleges no bad faith (or quasi-bad faith) in the 1997 tariff filings, we fail to understand how this case differs from one in which "a defendant has simply miscalculated revenue or demand and accidently exceeded its rate of return." *Id.* at 30, ¶ 74. We therefore remand the case for further explanation on this issue.

\* \* \*

We (1) deny ACS's petition for review of the Commission's classification of ISP-related traffic-sensitive costs as intrastate, (2) grant its petition regarding the Commission's failure to honor § 204(a)(3)'s bar on refunds as to ACS's 1998 rates and vacate the Order insofar as it grants damages for overcharges in 1998, and (3) remand the case to the Commission for (a) its consideration of the treatment of a rate-of-return violation for a monitoring period cut short by § 204(a)(3) filings, and (b) its reconsideration of the use of the IRS rate for non-large corporate overpayments for prejudgment interest.

*So ordered.*