KAREN LECRAFT HENDERSON, Circuit Judge,
concurring:
Novelty, Inc. (Novelty) petitions for review of the order of the United States Drug Enforcement Administration (DEA), Novelty Distributors, Inc., 73 Fed.Reg. 52,689 (Sept. 10, 2008) (Final Order), which revoked its registration to distribute list I chemical products pursuant to the Controlled Substances Act, 21 U.S.C. §§ 801 et seq. (CSA or Act). For the reasons set out below, I conclude that Novelty’s petition for review should be denied.
I.
The CSA requires “[ejvery person who ... distributes any ... list I chemical [to] obtain annually a registration issued by the Attorney General.” 21 U.S.C. § 822(a)(1). Section 823(h) requires the Attorney General to “register an applicant to distribute a list I chemical unless [he] determines that registration of the applicant is inconsistent with the public interest.” Id. § 823(h). The Attorney General considers five factors in determining whether registration is inconsistent with the public interest:
(1) maintenance by the applicant of effective controls against diversion of listed chemicals into other than legitimate channels;
(2) compliance by the applicant with applicable Federal, State, and local law;
(3) any prior conviction record of the applicant under Federal or State laws relating to controlled substances or to chemicals controlled under Federal or State law;
(4) any past experience of the applicant in the manufacture and distribution of chemicals; and
*1157 (5) such other factors as are relevant to and consistent with the public health and safety.
Id. § 823(h). The Attorney General may suspend or revoke a registration if the registrant “has committed such acts as would render his registration ... inconsistent with the public interest as determined under [21 U.S.C. § 823].” Id. § 824(a)(4). A list I chemical distributor must obtain a “[s]eparate registration ... at each principal place of business or professional practice where [it] ... distributes ... list I chemicals.” Id. § 822(e). The Attorney General has delegated the authority to deny, revoke or suspend registration to the DEA Administrator, 28 C.F.R. § 0.100(b), who has redelegated to the Deputy Administrator (DA). Id. § 0.104.
Novelty is an Indiana-based wholesale distributor of retail products to approximately 10,000 convenience stores in the United States, including over-the-counter pharmaceutical products containing ephedrine and pseudoephedrine. The CSA defines ephedrine and pseudoephedrine as “list I chemicals.” 21 U.S.C. § 802(34)(C) & (K). Ephedrine and pseudoephedrine have legitimate uses[1] but they can also be diverted for use in the manufacture of methamphetamine, a schedule II controlled substance. Id. § 812(c); 21 C.F.R. § 1308.12(d). In 1998, the DEA granted Novelty a certificate of registration authorizing it to distribute list I chemical products from its Greenfield, Indiana facility. The DEA renewed Novelty’s registration annually until 2008.
According to Novelty’s president,[2] Novelty stores its list I chemical products in a secure area in its registered Greenfield, Indiana warehouse. Administrative Hearing Transcript at 131-32, Novelty Distributors, Docket No. 08-33 (DEA Mar. 24-Apr. 1, 2008) (Hearing Tr.). Only employees who pass a background check and receive training are authorized to enter the secure area. Each Novelty sales representative services approximately 80 convenience store customers and makes deliveries to each customer approximately every two weeks. According to Novelty’s vice president of product, the customer tells the sales representative how many list I chemical products it needs and the sales representative orders them from Novelty’s Greenfield facility. Novelty drivers transport the list I chemical products weekly in company trucks to approximately 150 self-storage units that Novelty rents from independent self-storage facilities throughout the country. Novelty informs its sales representative of the time of delivery to the self-storage unit. The list I chemical products typically remain in the self-storage unit anywhere from a few hours to two days until the sales representative transfers them to his vehicle for delivery to the customer. Each self-storage unit is locked and has varying degrees of additional security as provided by the individual storage facilities. According to Novelty’s president, “there are cameras around ... a lot of [the storage facilities],” “[t]hey have access points” and “[t]hey have codes to get into places.” Id. at, 131. One Novelty sales representative testified that the self-storage unit he *1158 used had only a padlocked door for security. Id. at 538. None of Novelty’s approximately 150 self-storage units is registered with the DEA.
Novelty sells combination ephedrine and pseudoephedrine products of different strengths and in varying quantities per package and it carries more than ten product lines containing list I chemicals. Novelty’s vice president of product testified that Novelty limits each convenience store customer to one case of each product type per the sales representative’s bi-weekly delivery to reduce the risk of diversion. According to Novelty’s director of category management, Novelty enforces its one case per product type limit by issuing a warning to a noncompliant sales representative for a first infraction and terminating him for a second infraction. In addition, Novelty ceases selling list I chemical products to any customer purchasing in excess of one case per product type. Novelty’s director of category management testified that between January 2007 and January 2008, there were approximately 35 to 45 violations of the one case limit of an estimated 100,000 to 120,000 total transactions. According to one of the DEA investigators who testified, however, Novelty violated its one case limit 85 times between January and July 2007. According to another DEA investigator, during a November 2002 raid on an illegal methamphetamine lab in Connecticut, the DEA discovered ephedrine product manufactured by DMD Pharmaceuticals (DMD). DMD informed the DEA that in September 2002 it had shipped the product to Novelty for distribution. When the DEA contacted Novelty, Novelty was unable to identify the convenience stores that had purchased the ephedrine product later diverted.
On May 5, 2004, Dan Raber, Diversion Group Supervisor in the DEA’s Indianapolis District Office, sent Novelty and other Indiana registrants a letter regarding the transportation and delivery of list I chemical products to retailers. Letter from Dan E. Raber, Diversion Group Supervisor, to Novelty Distributors, Novelty Distributors, Docket No. 08-33 (May 5, 2004) (Raber Letter). The Raber Letter specifically addressed the practice of “storing List I chemical products (including over-the-counter ephedrine and pseudoephedrine items) and distributing them from satellite locations, such as commercial storage units, personal residences and or delivery vehicles.” Id. at 1. It “remind[ed] all registrants that ‘any ... distribution from[ ] a location other than the registered location (including the use of delivery vehicles for overnight storage) is a violation of federal law.’ ” Id. According to Novelty’s vice president of product, Novelty concluded that it had to register all 150 self-storage units or stop using the units for list I chemical products, which it declined to do. In September 2004, it filed suit in the Southern District of Indiana seeking a declaratory judgment that the Raber Letter constituted a rule making conducted without the requisite notice and comment. Novelty, Inc. v. Tandy, No. 04-cv-1502, 2006 WL 2375485, at * 1 (S.D.Ind. Aug.15, 2006). Almost four years later, on August 7, 2008, the district court granted the DEA’s motion for summary judgment, concluding that the Raber Letter was an interpretive rule that did not require notice and comment.[3] Novelty, Inc. v. Tandy, No. 05-cv-1502, 2008 WL 3835655, at *16 (S.D.Ind. Aug.7, 2008).
On January 17, 2008, the DA suspended Novelty’s registration and issued an order *1159 to show cause why the DEA should not revoke Novelty’s registration, setting forth several grounds therefor. Order to Show Cause and Immediate Suspension of Registration, Novelty Distributors, Docket No. 08-33 (DEA Jan. 17, 2008) (Suspension Order). First, Novelty used unregistered self-storage units to distribute list I chemical products, a factor weighing against Novelty’s continued registration under 21 U.S.C. §§ 823(h)(2) (noncompliance with applicable laws) and 824(a)(4) (acts inconsistent with public interest). Id. at 1. Second, Novelty distributed list I chemical products to its customers in quantities greater than could be used for legitimate purposes, a factor weighing against Novelty’s continued registration under 21 U.S.C. § 823(h)(1) (ineffective controls against diversion). Id. at 2. Third, Novelty maintained inaccurate records in violation of 21 U.S.C. § 830(a) (record keeping requirements for list I chemical transactions) and 21 C.F.R. § 1310.04.[4] Id. Fourth, Novelty distributed ephedrine and pseudoephedrine products to retailers that were not self-certified as required by 21 U.S.C. § 830(e)(l)(B)(i).[5] Id. Fifth, Novelty distributed list I chemical products packaged in a form that did not comply with 21 U.S.C. § 830(d)(2).[6] Id. at 2-3. Sixth, Novelty distributed list I chemical products in Kentucky and North Carolina in a form (tablets instead of gel-caps) prohibited by their respective state laws. Id. at 3. Based on the above-cited grounds, the DA found that “the scheduled listed chemical products distributed by Novelty have been, and are likely to continue to be, diverted into the illicit manufacture of methamphetamine” and that “Novelty has failed to maintain effective controls against such diversion as required by 21 U.S.C. § 823(h)(1).” Id. Accordingly, the DA concluded that “Novelty’s continued registration ... would constitute an imminent danger to the public health and safety.” Id.
Shortly after the Suspension Order issued, Novelty approached an ephedrine product manufacturer proposing that Novelty act as its sales agent. Novelty offered to receive retailers’ orders for ephedrine products and then transmit the orders to the manufacturer. The manufacturer would then use a third-party shipper to “distribute” the ephedrine products directly to the retailers. Under Novelty’s proposal, the retailer itself could either prepare[7] the ephedrine product for sale or the Novelty sales representative could do *1160 so when he next called on the retailer. The manufacturer rejected the proposal.
Novelty requested a hearing before an administrative law judge (ALJ) as allowed by the Suspension Order. The hearing was held from March 24 to April 2, 2008. The ALJ then issued her decision, rejecting the charges that Novelty had (1) distributed list I chemical products to retailers that were not self-certified, (2) distributed ephedrine products packaged in a nonconforming way and (3) distributed ephedrine products in Kentucky and North Carolina in violation of state law. Recommended Rulings, Findings of Fact, Conclusions of Law, and Decision of the ALJ, Novelty Distributors, Docket No. 08-33, at 37-40, 71-72, 78-79 (DEA May 21, 2008) (ALJ Decision). The ALJ found, however, that Novelty did not maintain effective controls against diversion under 21 U.S.C. § 823(h)(1) based both on its record-keeping errors and on multiple violations of its one case per product type limit.[8] The ALJ declined to decide whether 21 U.S.C. § 822(e) (requiring “separate registration at each principal place of business” where list I chemicals are distributed) required Novelty to register its self-storage units because of the then-pending litigation regarding the Raber Letter in the Southern District of Indiana. Id. at 91 n. 38. Nevertheless, the ALJ did find that Novelty had a duty to comply with the Raber Letter until the litigation challenging Raber’s interpretation of the statute was resolved, which duty Novelty failed to meet and, as a consequence thereof, Novelty’s failure weighed in favor of revocation under 21 U.S.C. § 823(h)(2). Id. at 91. While the ALJ found that the first two factors listed in section 823(h) supported the conclusion that Novelty’s continued registration was inconsistent with the public interest, she found that the third factor (prior convictions), fourth factor (past distribution experience) and fifth factor (other considerations) weighed in Novelty’s favor and thus were consistent with the public interest under 21 U.S.C. § 823(h)(3), (4) and (5), respectively. The ALJ recommended that the DA “levy compliance requirements upon [Novelty].”[9] Id. at 101. On review, the DA instead revoked Novelty’s registration. Final Order at 52,704. Novelty timely petitioned for review under the Administrative Procedure Act, 5 U.S.C. § 702, and the CSA, 21 U.S.C. § 877.
II.
Under the APA, we must “set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A). “Findings of fact by the Attorney General [are conclusive] if supported by substantial evidence.” 21 U.S.C. § 877. We “ ‘may not find substantial evidence merely on the basis of evidence which in and of itself justified [the agency’s decision], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.’ ” Morall v. DEA, 412 F.3d 165, 177 (D.C.Cir.2005) (quoting Lakeland Bus Lines, Inc. v. NLRB, 347 F.3d 955, 962 (D.C.Cir.2003) (internal quotations omitted)) (alteration in Morall). The DEA is the ultimate fact finder but “[t]he agency’s
*1161 departures from the [ALJ’s] findings are vulnerable if they fail to reflect attentive consideration to the [ALJ’s] decision.” Id. (quoting Greater Boston Television Corp. v. FCC, 444 F.2d 841, 853 (D.C.Cir.1970)) (first alteration added). To uphold agency action, we must determine “that the agency examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.” Id. (quoting El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep’t of Health & Human Servs., 396 F.3d 1265, 1276 (D.C.Cir.2005) (internal quotations omitted)) (alteration in original). In determining the public interest under the factors set forth in 21 U.S.C. § 823(h), the DA need not “make findings as to all of the factors enumerated.... Rather, he may give each factor the weight he deems appropriate.” Id. at 173-74 (internal quotations omitted) (ellipsis in original). We “review the DA’s decision! ], insofar as [it] interprets] statutes, under the standard articulated by the Supreme Court in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).” Wedgewood Vill. Pharmacy v. DEA, 509 F.3d 541, 549 (D.C.Cir.2007). Under Chevron step 1, if a statute is unambiguous, then we “must give effect to the unambiguously expressed intent of Congress.” Chevron, 467 U.S. at 843, 104 S.Ct. 2778. If the statute is ambiguous, we move to Chevron step 2 and “must defer to the agency’s interpretation as long as it is ‘based on a permissible construction of the statute.’ ” Creekstone Farms Premium Beef, L.L.C. v. Dep’t of Agrie., 539 F.3d 492, 498 (D.C.Cir.2008) (quoting Chevron, 467 U.S. at 843, 104 S.Ct. 2778). Although Novelty raised a host of objections both to the DA’s investigation and to the Final Order, I conclude that only the following merit discussion.[10]
A.
Novelty argues that the DA failed to consider contradictory evidence and failed to explain her departure from the ALJ’s recommended sanction. Novelty lists numerous facts favorable to it that the ALJ relied upon but that the DA allegedly disregarded. Pet’r Br. at 23-30. Contrary to Novelty’s assertion, the DA referenced most of the listed facts in her Final Order. Those facts not explicitly mentioned' — such as areas of Novelty’s distribution system free of the risks she identified in other areas — are either irrelevant to the DA’s reasoning or of little weight, such as the fact that many of Novelty’s packages were secured with plastic zip-ties. I can “reasonably discern,” ACS of Anchorage, Inc. v. FCC, 290 F.3d 403, 408 (D.C.Cir.2002), that the DA considered the holes she identified in Novelty’s distribution system to be serious notwithstanding an otherwise compliant background; that is, to find Novelty’s distribution system flawed, she was hardly required to identify every non-flawed aspect of it.
The DA also adequately explained why she revoked Novelty’s registration despite *1162 the ALJ’s recommendation to impose compliance conditions. The DA acknowledged that “the evidence points to some measures which [Novelty] voluntarily undertook” to prevent diversion. Final Order at 52,703. But the DA found that “these measures do not address the serious problems with its distribution practices that are established by the record, and which were either ignored, or discounted by the ALJ.” Id. The ALJ found that Novelty’s “10 year history of compliance, as evidenced by the DEA’s continued registration,” weighed against revocation. ALJ Decision at 100-01. The DA did not regard Novelty’s registration renewals as “probative of a registrant’s record of compliance,” stating that “[t]here are a variety of reasons why the Agency may not be prepared to go forward with a Show Cause Proceeding at a particular time including, inter alia, a lack of resources, the complexity of the matters under investigation, and the need to pursue other enforcement priorities.” Final Order at 52,702 n.53. The ALJ viewed favorably Novelty’s “willingness to comply with the laws and regulations,” ALJ Decision at 98, but the DA was not persuaded by Novelty’s willingness to change because of the “sustained nature of the violations and [its] failure to voluntarily cease its misconduct.”[11] Final Order at 52,703. I conclude that the Final Order “reflect[s] attentive consideration to the [ALJ’s] decision,” Morall, 412 F.3d at 177 (internal quotations omitted) (alteration in original), and took into account contradictory evidence.
B.
Novelty argues that the CSA does not require it to register its rented self-storage units. The CSA requires “[a] separate registration ... at each principal place of business or professional practice where the applicant manufactures, distributes, or dispenses controlled substances or list I chemicals.” 21 U.S.C. § 822(e); see also 21 C.F.R. § 1309.23(a) (“A separate registration is required for each principal place of business at one general physical location where List I chemicals are distributed.... ”). “[Distribute” means “to deliver (other than by administering or dispensing) a controlled substance or a listed chemical.” 21 U.S.C. § 802(11). “Deliver” means “the actual, constructive, or attempted transfer of a controlled substance or a listed chemical, whether or not there exists an agency relationship.” Id. § 802(8).
Novelty makes two arguments to support its reading of section 822(e) not to require the registration of each of the self-storage units. First, it asserts that each self-storage unit is not a “place of business ... where [it] ... distributes ... list I chemicals.” Id. § 822(e) (emphasis added). I disagree. A Novelty truck driver transports the ephedrine products from the Greenfield, Indiana facility to the self-storage unit, where the ephedrine products remain for several hours or days. The sales representative then transfers the products to his vehicle for delivery to Novelty’s convenience store customers. The unit is therefore a “place of business” because it is a “general physical location” whence Novelty distributes ephedrine products. 21 C.F.R. § 1309.23(a). In other words, the Novelty sales representative distributes the ephedrine products from the self-storage units to retailers.[12]
*1163 Second, Novelty argues that each self-storage unit is not a “principal place of business.” 21 U.S.C. § 822(e) (emphasis added). The CSA does not define “principal place of business.” The word “principal” means “most important, consequential, or influential.” Merriam-Webster’s Third New Int’l Dictionary Unabridged 1802 (1993); see also United States v. Clinical Leasing Serv., Inc., 925 F.2d 120, 123 (5th Cir.1991) (defining “principal” in 21 U.S.C. § 822(e) as “important [or] consequential” (quoting Webster’s New Collegiate Dictionary 908 (1979)) (alteration in original)). While the statute does not require registration of every place of business whether or not it is a “principal” one, as the DA correctly noted, the statute plainly contemplates the existence of more than one “principal place of business” as manifested by the use of “each” in requiring “each principal place of business” to be registered. See Final Order at 52,701. Nevertheless, in my view, “principal” — as used in section 822(e) — is ambiguous because the Congress has not supplied criteria, e.g., a minimum percentage of total products distributed from a location, to guide the DEA. I am therefore required to reach Chevron step 2. See Pub. Serv. Co. of Colo. v. FERC, 91 F.3d 1478, 1482 (D.C.Cir.1996). The DEA must decide which “place[s] of business” are “principal” in each registrant’s distribution system. I must examine whether its reading — requiring Novelty to register the self-storage units — is “based on a permissible construction” of 21 U.S.C. § 822(e). Chevron, 467 U.S. at 843,104 S.Ct. 2778.
Notwithstanding Novelty’s assertion that each self-storage unit “processes a small fraction of Novelty’s total [list I chemical] produces] shipped nationwide,” Pet’r Br. at 49, all of the list I chemical products it distributes passes through a self-storage unit. Moreover, as noted earlier, the DA permissibly found that the products remain at the units for up to several days at a time. Each storage unit is therefore “important” and “consequential” to Novelty’s distribution system. The DA’s interpretation of “principal” also correctly relied on the statutory context.[13] See Pharm. Research & Mfrs. of Am. v. Thompson, 251 F.3d 219, 224-25 (D.C.Cir. 2001) (examining context, including statutory purpose, in interpreting statute’s wording). The DA also rejected Novelty’s interpretation because it “would clearly frustrate the Congressional purpose.” Final Order at 52,701.
In enacting the CSA’s registration provisions, Congress’ purpose was to protect against diversion by requiring that those persons who propose to engage in the legitimate distribution of controlled substances and listed chemicals apply for a *1164 registration, notify this Agency of the proposed location of their activity, and submit the facility for inspection by the Agency to ensure that it has adequate security controls and procedures. See, e.g., 21 U.S.C. 822(f) (authorizing the Attorney General “to inspect the establishment of a registrant or applicant for registration”). Indeed, inspection by the Agency of a proposed facility is fundamental to the CSA’s mandate to protect the public interest. Id. 823(h); see also 21 CFR 1309.41.
Id.; see also 21 C.F.R. § 1309.71 (listing factors DA must consider in evaluating effectiveness of security controls and procedures). The DEA cannot inspect a facility it either does not know exists or the location of which it does not know.
The DA also noted the “perverse incentive” created by interpreting “principal” based on the volume of business at a particular location instead of the nature of that business. Final Order at 52,701. An interpretation “which determines whether a facility must be registered by looking to the amount of business activity that occurs out of a facility rather than the nature of the activity that occurs therein, would encourage an entity to keep adding warehouses or storage facilities so that it could eventually claim that its warehouses were no longer principal places of business and were thus not subject to the registration requirement.” Id.
I conclude that the DA reasonably construed 21 U.S.C. § 822(e) to require that each of Novelty’s self-storage units is a “principal placets] of business” subject to the registration requirement.[14]
C.
Finally, Novelty challenges the DA’s reliance on several facts in support of revocation.[15] First, Novelty argues that its failure to enforce its one case of each *1165 ephedrine product per sales visit limit did not violate any statute or regulation but instead its self-imposed limit. But the DA did not conclude that Novelty violated any law by not enforcing its limit. Novelty asserted that its one case limit constituted an effective control against diversion and the DA rejected the one case limit as an effective control because Novelty did not enforce it, a finding the evidence supports. See Final Order at 52,693 (Novelty sales representatives violated one case limit 85 times between January and July 2007).
Second, Novelty argues that it should not be penalized for continuing to use self-storage units while its challenge to the Raber Letter was pending in the Southern District of Indiana. See id. at 52,703 (“[Noveltyl’s disregard of the letter and continuation of its practices for some forty-four months makes its conduct especially egregious.”). Novelty stopped distributing list I chemical products — and thus stopped using the self-storage units for the products — once the Suspension Order issued on January 17, 2008. The Indiana district court rejected Novelty’s challenge to the Raber Letter on August 7, 2008. In revoking Novelty’s registration, the DA relied on Novelty’s failure to register the self-storage units following the Raber Letter and its failure to enforce its one case limit as evidence that compliance conditions alone would not protect the public interest. Id. Novelty argues that its failure to register the self-storage units does not demonstrate its unwillingness to comply because its non-compliance was based on its good faith belief that the Raber Letter was invalid, as evidenced by its legal action challenging the letter.[16] Who was responsible for Novelty’s continued use of self-storage units pendente lite— whether Novelty because it did not seek to stay the Raber Letter or the DEA because it did not attempt to enforce the Raber Letter until some forty months after issuance — we do not decide inasmuch as the DA found that Novelty’s “failure to enforce its own policies [i.e., the one-case limit] provides reason alone to conclude it cannot be trusted to adhere to compliance conditions.” Final Order at 52,704. As the DA’s sanction would have been the same even absent this factor, I need not review her analysis of it. See PDK Labs. Inc. v. DEA 362 F.3d 786, 799 (D.C.Cir.2004) (“If the agency’s mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.”). For similar reasons, I need not reach the question whether the DA erred in finding that Novelty “attempt[ed] to circumvent the suspension order,” Final Order at 52,703, by proposing acting as a sales agent.[17]
*1166 Third, Novelty argues that substantial evidence does not support the finding that Novelty had “serious recordkeeping deficiencies.” Final Order at 52,698. A registrant must “provide effective controls and procedures to guard against theft and diversion of List I chemicals,” 21 C.F.R. § 1309.71(a), which includes maintaining “systems for monitoring the receipt, distribution, and disposition of List I chemicals.” Id. § 1309.71(b)(8); see also id. § 1310.03 (list I chemical products distributors must keep record of all regulated transactions and file reports with DEA). The records must be “readily retrievable and available for inspection.” Id. § 1310.04(d). Novelty does not dispute the fact of the record keeping deficiencies the DA cited in support of her finding, see Final Order at 52,698-99, but instead asserts they do not add up to inadequate records. Pet’r Br. at 57-58. The DA cited the fact that Novelty was missing invoices for sales of list I chemical products and that its records contained inadequate and inaccurate information regarding shipment dates and delivery locations. Final Order at 52,698-99. I conclude that these deficiencies support the finding that Novelty’s “failure to maintain adequate records ... constitutes ... a violation of Federal law.” Id. at 52,699; see 21 U.S.C. § 830(a) (record keeping requirements for list I chemical transactions). I also reject Novelty’s assertion that the DA did not adequately explain her disagreement with the ALJ’s description of Novelty’s records as “thorough.” ALJ Decision at 84. But the ALJ also found several errors in Novelty’s records, concluding that they were “not adequate to conduct an effective audit of [Novelty’s list I chemical] products.” Id. at 86, 88. The DA as the ultimate fact-finder is entitled to ascribe different significance to the deficiencies of Novelty’s records. Cf. Reckitt & Colman, Ltd. v. Adm’r, 788 F.2d 22, 26-27 (D.C.Cir.1986). Accordingly, I reject Novelty’s sufficiency challenge to the evidence supporting the DA’s deficient record keeping finding.
*1167 For the foregoing reasons, I conclude that Novelty’s petition for review should be denied.

. “Pseudoephedrine is a decongestant used for the temporary relief of nasal congestion due to the common cold, hay fever, or other upper respiratory allergies. Ephedrine is used for the temporary relief of shortness of breath, tightness of chest, and wheezing due to bronchial asthma.” DEA, Security Requirements for Handlers of Pseudoephedrine, Ephedrine, and Phenylpropanolamine, 69 Fed.Reg. 45,616, 45,616 (July 30, 2004).

. Novelty’s president as well as other Novelty officials and various DEA personnel testified at the administrative hearing held to decide whether Novelty’s registration should be revoked. See infra at 1180.

. From the Raber Letter's issuance in May 2004 until the Suspension Order issued in January 2008, Novelty continued using the self-storage units for distribution of list I chemical products. See infra at 1182-83.

. A distributor must keep records of “regulated transaction^] involving a listed chemical ... for two years after the date of the transaction.” 21 U.S.C. § 830(a). The records must be "retrievable and shall include the date of the regulated transaction, the identity of each party to the regulated transaction, a statement of the quantity and form of the listed chemical, a description of the tableting machine or encapsulating machine, and a description of the method of transfer.” 21 U.S.C. § 830(a)(2); see also 21 C.F.R. § 1310.04 (tracking 21 U.S.C. § 830(a)).

. “A regulated seller may not sell any scheduled listed chemical product at retail unless the seller has submitted to the Attorney General the self-certification referred to in sub-paragraph (A)(vii).” 21 U.S.C. § 830(e)(l)(B)(i). Subparagraph (A)(vii) requires a seller to "submit[] to the Attorney General a self-certification that all [employees of the seller who deliver list I chemical products to the consumer's custody] have ... undergone training provided by the seller.” Id. § 830(e)(l)(A)(vii).

. "With respect to ephedrine base [or] pseudoephedrine base ... in a scheduled listed chemical product ... a seller or distributor may not sell such a product in nonliquid form (including gel caps) at retail unless the product is packaged in blister packs, each blister containing not more than 2 dosage units, or where the use of blister packs is technically infeasible, the product is packaged in unit dose packets or pouches.” 21 U.S.C. § 830(d)(2).

. Preparation for sale involves removing the ephedrine product from the box in which it is *1160 shipped and placing the product in the retailer’s secure display cabinet.

. The DA cited the DMD Pharmaceuticals diversion, supra at 1178, as evidence thereof. Final Order at 52,694.

. The ALJ recommended that the DA "use her discretion to levy compliance requirements upon [Novelty] to a degree that would satisfy the DEA that [Novelty] is operating [sic] with the DEA to protect the public interest.” ALJ Decision at 101.

. Novelty made the following additional objections: (1) the DA imposed a no-risk standard on distributors of list I chemical products to convenience stores and small retailers contrary to "congressional intent,” Pet'r Br. at 31; (2) the DA did not articulate a discernible standard of acceptable risk of diversion, id. at 32; (3) the DA’s revocation of Novelty’s registration was part of a biased enforcement campaign against distributors of list I chemical products to convenience stores and small retailers, id. at 33-35; (4) the DA exhibited prejudgment bias, id. at 38-43; see generally Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); and (5) DEA agents imposed a prior restraint — in violation of the First Amendment to the United States Constitution — on Novelty’s video and audio recording of DEA investigators while they conducted their investigation of Novelty, Pet’r Br. at 43-47. I reject these objections as meritless.

. As noted earlier, after the Suspension Order issued, Novelty approached an ephedrine manufacturer about acting as the latter’s sales agent, see supra at 1179, rather than either registering each of the self-storage units or discontinuing their use. At the time of the hearing, moreover, a Novelty executive testified that the sales agent proposal was "[something that we're still continuing to explore.” Hearing Tr. at 2403.

. Both parties note that the DEA excepts from registration "[a] warehouse where List I *1163 chemicals are stored by or on behalf of a registered person, unless such chemicals are distributed, directly from such warehouse to locations other than the registered location from which the chemicals were originally delivered.” 21 C.F.R. § 1309.23(b)(1) (emphases added). Because Novelty’s list I chemical products are distributed directly from the self-storage units to customers, the units do not come within the warehouse exception.

. The DA noted:
Congress imposed on a registrant the obligation to obtain a separate registration at “each principal place of business * * * where the applicant * * * distributes * * * List I chemicals.” 21 U.S.C. 822(e) (emphasis added).... In determining whether a facility is a principal place of business within the meaning of the CSA, the Act looks to the nature of the activity that occurs at the particular location and not at the dollar volume of business that is transacted out of the facility. See 21 CFR 1309.23(b)(2) (exempting from registration “[a]n office used by agents of a registrant where sales of List I chemicals are solicited, made, or supervised but which neither contains such chemicals ... nor serves as a distribution point for filling sales orders”).
Final Order at 52,701 (alteration of statute and regulation in original).

. As my dissenting colleague points out, Dissenting Opinion at 1193, the DA concluded that section 822(b) "requires that a separate registration be obtained at each location at which List I chemicals are distributed.” Final Order at 52,700 (emphasis in original). Because, as the DA found, Novelty’s self-storage units fit within the statutory language of a "principal place of business ... where [Novelty] ... distributes ... list I chemicals,” id. § 822(e), I do not reach her more general pronouncement that every place of business where list I chemicals are distributed must be registered.

. Novelty also challenges the sufficiency of the evidence to support the DA's finding that Novelty distributed list I chemical products in excess of legitimate demand to some convenience stores. Final Order at 52,699-700. At the hearing, the DEA’s expert witness testified that the average monthly expected retail value of list I chemical products to satisfy legitimate demand is $14.39 per convenience store. Both the AU and the DA rejected the DEA expert’s legitimate demand analysis and his conclusion that any ephedrine product sale above $14.39 per month was presumably diverted to methamphetamine manufacturing. Final Order at 52,694. The DA used a different method to determine excessive distribution. She compared the average monthly retail value of list I chemical products distributed to each Novelty customer during the three months before the Suspension Order issued with the average monthly retail value of list I chemical products distributed by Novelty to all of its customers. A Novelty executive testified that, on average, Novelty distributed list I chemical products with a retail value of approximately $640 to each customer per month. But the DA found that within three months of the Suspension Order's issuance, Novelty distributed list I chemical products with an average monthly retail value in excess of $2,000 to approximately 120 customers, in excess of $4,000 to 9 customers and in excess of $7,000 to one customer. Id. at 52,699. While I question the probative value of looking at sales that "greatly exceed[]” the average without statistical analysis, id. at 52,700, I need not reach the issue because I conclude that the Final Order is supported on other grounds, see infra note 17.

. Novelty also asserted that its legal challenge to the Raber Letter was motivated by its belief that using the common carrier alternative to deliver list I chemical products to its customers created a higher risk of diversion than its distribution system. Pet'r Br. at 55; Final Order at 52,701. The DA rejected Novelty’s assertion, concluding that Novelty produced no evidence of diversion when products were shipped by common carrier. Final Order at 52,701-02.

. As noted earlier, between the Suspension Order and the ALJ's decision, Novelty proposed to an ephedrine products manufacturer that Novelty act as its sales agent. The CSA exempts from registration "[a]n agent or employee of any registered manufacturer, distributor, or dispenser of any controlled substance or list I chemical if such agent or employee is acting in the usual course of his business or employment,” 21 U.S.C. § 822(c)(1), and thus, according to Novelty, had the manufacturer agreed, Novelty would have been exempt from registration.
My dissenting colleague believes that I must decide the circumvention issue and remand if I disagree with the DA, relying on PDK Laboratories Inc. Dissenting Opinion at 1198. Assuming without concluding that I did in fact disagree with the DA on this point, PDK Laboratories Inc. would not support remand here. In PDK Laboratories Inc., we vacated the DA’s decision and remanded for the DA to recon *1166 sider his interpretation of a statute. 362 F.3d at 797-99. We then noted that even if we had upheld the DA’s statutory interpretation, we "would still have to vacate the [DA's] decision and remand the case” because the DA had failed to distinguish DEA precedent in finding certain regulatory violations. Id. at 798-99. The DA made his decision based on "the totality of the circumstances” and "four of the 'circumstances' prominently mentioned were [the regulatory] ... violations.” Id. at 799. We found it "impossible to discern” the "weight he gave to those circumstances” and noted that, if the DA concluded on remand that the petitioner's actions were not regulatory violations, the outcome could change. Id. In contrast, the DA's conclusion that Novelty attempted to circumvent the Suspension Order is not a "prominent” reason for the Final Order revoking Novelty’s registration. The DA concluded that the first (maintenance of effective controls against diversion) and second (statutory compliance) factors under 21 U.S.C. § 823(h) “strongly support[]” revocation. Final Order at 52,700, 52,702 (emphasis added). She found that' the fourth factor (past distribution experience) and fifth factor (other considerations) “also support[ ]" revocation. Id. at 52,702-03 (emphasis added). The sole consideration under the fifth factor was Novelty’s "attempt to circumvent the suspension order.” Id. at 52,703. In selecting a sanction, the DA cited, first, Novelty's failure to register the self-storage units and, second, Novelty’s failure to enforce its one case limit, id., concluding, as noted above, "[Novelty’s] failure to enforce its own policies provides reason alone to conclude that it cannot be trusted to adhere to compliance conditions.” Id. at 52,704. She found "further support[]” for revocation — as opposed to imposing compliance conditions — in Novelty's "sustained and flagrant violations of Federal law, as well as its attempt to circumvent the suspension order.” Id. Accordingly, Novelty's alleged attempt to circumvent the Suspension Order was merely an additional factor supporting revocation and, if incorrect, would not have altered the outcome. Remand is therefore unnecessary.